IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19 CV 00360-LCB-LPA

MANUEL MORENO,

    Plaintiff,

  vs.

SHAHZAD AHMED, in his individual
and official capacity;  SALENA
BARTEE, in her individual and official
capacity; JAPETH BETT, in her
individual and official capacity; CAROL
BOSHOLM, in her individual and
official capacity; JOSH BRINKLEY, in
his individual and official capacity;
PAULA CHAVIS, in her individual and
official capacity; JAMEY COBB, in his
individual and official capacity; JOSE
CRUZ, in his individual and official
capacity; JEREMY EDWARDS, in his
individual and official capacity;  KEN
HARRIS, in his individual and official
capacity; JAMES HUNT, in his
individual and official capacity; BRIAN
KERSTETTER, in his individual and
official capacity; CODY LOCKLEAR, in
his individual and official capacity;
TIFFANY LOCKLEAR, in her
individual and official capacity;
YAHAIRA MARTINEZ, in his
individual and official capacity;
MICHAEL MORSE, in his individual
and official capacity; JULIO RAMOS, in
his individual and official capacity;
VICTORIA RAMSEY, in her individual
and official capacity; RODNEY SHAW,
in his individual and official capacity;
HEATHER SULLIVAN, in her
individual and official capacity; CAROL
TORRES, in her individual and official
capacity; SHAKENA VARNADO, in her
individual and official capacity; JOHN

**FIRST AMENDED COMPLAINT**
**(Jury Trial Demanded)**

WARNER, in his individual and official capacity; and THOMAS WARNER, in his individual and official capacity;

Defendants.

Plaintiff Manuel Moreno ("Plaintiff" or "Mr. Moreno"), by and through counsel, hereby brings this First Amended Complaint for violations of his civil rights pursuant to 42 U.S.C. § 1983 against the named Defendants, who are employees of the North Carolina Department of Public Safety ("NCDPS"), a public entity, and/or the North Carolina Department of Correction ("NCDOC"), a public entity (collectively, the "Defendants"), and alleges the following based on personal knowledge and information and belief:

**INTRODUCTION**

This is an action for damages and injunctive relief pursuant to 42 U.S.C. § 1983 and the First, Eighth and Fourteenth Amendments to the United States Constitution, and under North Carolina state negligence law stemming from Defendants' ongoing failure to provide Plaintiff with medical treatment for a serious medical condition in February 2016—namely, the H1N1 virus and acute upper respiratory failure from a severe allergic reaction to amoxicillin, which Defendants, upon information and belief, prescribed for him knowing he was allergic. Defendants' constitutional violations ultimately resulted in Plaintiff succumbing to and remaining in a coma for nearly four months. Because of Defendants' actions and omissions, Plaintiff has suffered permanent physical injuries as well as emotional distress and lost wages.

2

Plaintiff seeks monetary damages to compensate him for these injuries, punitive damages, and injunctive relief.

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and the Civil Rights Act pursuant to 42 U.S.C. § 1983 and the First, Eighth and Fourteenth Amendments to the United States Constitution, wherein Plaintiff seeks to redress deprivations by Defendants, and under North Carolina state negligence law.

2.      Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions.

3.      At all times mentioned herein, all Defendants were acting under color of state law, and rights secured to Mr. Moreno by the First, Eighth and Fourteenth Amendments to the United States Constitution and the laws of the United States.

4.      Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law.

5.      This Court has supplemental jurisdiction over those claims asserted under state law by virtue of 28 U.S.C. § 1367.

6.      Venue is founded in this judicial district upon 28 U.S.C. § 1391 as the acts complained of arose in this district.

## PARTIES

7.      In February 2016, Plaintiff Manuel Moreno was a 39-year-old inmate of the North Carolina state prison Scotland Correctional Institution ("SCI"), located at 22383 McGirts Bridge Rd, Laurinburg, NC 28352. At all times relevant to this case,

3

Mr. Moreno's prison identification number was and is 1312954. While incarcerated at SCI, Mr. Moreno was housed on Tan 2 D-Pod. After an extended hospital stay at several hospitals and rehabilitation at Central Prison, Mr. Moreno eventually was transferred to the North Carolina state prison Greene Correctional Institution ("GCI"), located at 2699 NC-903, Maury, NC 28554, where he is currently incarcerated, on or about December 7, 2017. Mr. Moreno's projected release date is April 17, 2030.

8.     Defendant Jamey Cobb is the Superintendent for GCI and is an employee of the State of North Carolina. Defendant Cobb is alleged to have been acting, at all times relevant to this case, in both his individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983. Defendant Cobb, as Superintendent at GCI, had the professional responsibility and duty to ensure Mr. Moreno's receipt of mail essential to Mr. Moreno's case.

9.     Defendant Carol Bosholm, M.D. was a Physician for SCI and was an employee of the State of North Carolina at all times relevant to this case. Regardless of her employer, providing inmate healthcare is a function historically the exclusive responsibility of the government and therefore a public function. Defendant Bosholm is alleged to have been acting, at all times relevant to this case, in both her individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983. Defendant Bosholm, as physician for SCI, had the professional responsibility and duty to ensure and provide the proper medical care to prisoners.

10. Defendant Victoria Ramsey was a Physician's Assistant for SCI and was an employee of the State of North Carolina at all times relevant to this case. Regardless of her employer, however, providing inmate healthcare is a function historically the exclusive responsibility of the government and therefore a public function. Defendant Ramsey is alleged to have been acting, at all times relevant to this case, in both her individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983. Defendant Ramsey, as physician assistant for SCI, had the professional responsibility and duty to ensure and provide the proper medical care to prisoners.

11. Defendant Heather Sullivan was a Lead Nurse for SCI and was an employee of the State of North Carolina at all times relevant to this case. Regardless of her employer, providing inmate healthcare is a function historically the exclusive responsibility of the government and therefore a public function. Defendant Sullivan is alleged to have been acting, at all times relevant to this case, in both her individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983. Defendant Sullivan, as lead nurse for SCI, had the professional responsibility and duty to ensure and provide the proper medical care to prisoners.

12. Defendants Josh Brinkley and Japeth Bett were nurses for SCI and employees of the State of North Carolina at all times relevant to this case. Regardless of their employer, providing inmate healthcare is a function historically the exclusive responsibility of the government and therefore a public function. Defendants Brinkley and Bett are alleged to have been acting, at all times relevant to this case,

5

in both their individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983. Defendants Brinkley and Bett, as nurses for SCI, had the professional responsibility and duty to ensure and provide the proper medical care to prisoners.

13.    Defendant Carol Torres was a Captain at SCI over Tan 2 D-Pod at all times relevant to this case. She was an employee of the State of North Carolina. Defendant Torres is alleged to have been acting, at all times relevant to this case, in both her individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983. Defendant Torres, as captain at SCI, had the professional responsibility and duty to ensure the safety of prisoners at SCI.

14.    Defendants Salena Bartee and Ken Harris were Correctional Sergeants for SCI over Tan 2 D-Pod in at all times relevant to this case. They were employees of the State of North Carolina. Defendants Bartee and Harris are alleged to have been acting, at all times relevant to this case, in both their individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983. Defendants Bartee and Harris, as correctional sergeants at SCI, had the professional responsibility and duty to ensure the safety of prisoners at SCI.

15.    Defendants Paula Chavis, Jose Cruz, Jeremy Edwards, James Hunt, Brian Kerstetter, Cody Locklear, Tiffany Locklear, Yahaira Martinez, Michael Morse, Julio Ramos, Rodney Shaw, Shakena Varnado, John Warner, and Thomas Warner were Correctional Officers for SCI in Tan 2 D-Pod in at all times relevant to this case. They are employees of the State of North Carolina. Defendants Chavis, Cruz,

6

Edwards, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Shaw, Varnado, J. Warner, and T. Warner are alleged to have been acting, at all times relevant to this case, in both their individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.  Defendants Chavis, Cruz, Edwards, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Shaw, Varnado, J. Warner, and T. Warner, as correctional officers at SCI, had the professional responsibility and duty to ensure the safety of prisoners at SCI.

16.　　Defendant Shahzad Ahmed, M.D. was a Physician for Central Prison and was an employee of the State of North Carolina at all times relevant to this case. Regardless of his employer, providing inmate healthcare is a function historically the exclusive responsibility of the government and therefore a public function.  He is alleged to have been acting, at all times relevant to this case, in both his individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.

## STATEMENT OF FACTS

17.　　Prior to February 2016, Mr. Moreno was extremely healthy.  His only health concerns were psoriasis, gastro-esophageal reflux disease (commonly referred to as "GERD"), and an unspecified nail disorder.

18.　　According to Scotland Memorial Hospital records, Mr. Moreno had a documented allergy to amoxicillin.  A common allergic reaction to amoxicillin known to all competent medical providers is a maculopapular rash, typically around the neck and chest area.  Fatal anaphylaxis is another allergic reaction to amoxicillin known

7

to all competent medical providers, which, when not properly treated, can lead to acute renal failure, seizures, coma, and death.

## I.     <u>Poor Medical Care Rendered by NCDPS.</u>

19.     As an inmate at SCI, Mr. Moreno had to rely on SCI authorities to treat his medical needs. Their failure to do so, as described herein, meant that Mr. Moreno's medical needs were not met and he had no recourse.

20.     On February 26, 2016, between around 6:00 p.m. and 8:00 p.m., Mr. Moreno, along with eighteen (18) other inmates housed on Tan 2 D-Pod at SCI, went to the Health Service department ("Medical") at SCI for flu-like symptoms. Defendant Bartee accompanied the ill inmates to Medical.

21.     Defendant Sullivan assessed the nineteen (19) ill inmates, including Mr. Moreno; deemed them contagious; and forwarded their charts to Defendant Bosholm.

22.     Mr. Moreno had exhibited flu-like symptoms for the previous five days, including a sore throat, body aches, sinus pain and pressure, coughing up green sputum, cough, and sinus congestion. Defendant Bosholm diagnosed Mr. Moreno with acute pharyngitis, a painful throat condition often associated with flu, and noted his flu-like symptoms.

23.     Mr. Moreno relied on Defendant Bosholm to treat his medical needs. However, she did not.

24.     Confusingly, Defendant Bosholm prescribed Mr. Moreno amoxicillin—an antibiotic used to treat bacterial infections, even though the flu is a viral infection—in reckless disregard to Mr. Moreno's documented allergy to amoxicillin

8

and need for flu medication. Amoxicillin is not approved for treating the flu. Selecting it as a treatment was and is medically unacceptable in light of Mr. Moreno's circumstances, and choosing to prescribe it for Mr. Moreno was and is in conscious disregard of an excessive risk to Mr. Moreno's health.

25. Mr. Moreno took the amoxicillin as directed by Defendant Bosholm.

26. Defendant Bosholm did not give Mr. Moreno any flu medication, such as Tamiflu, or an anti-viral, in reckless disregard of his clear need for such medication.

27. Once Defendant Bosholm gave Mr. Moreno amoxicillin, she sent him back to Tan 2 D-Pod with the other ill inmates, where he would receive no further medical care until he was hours away from a coma on February 29, 2016.

28. From February 26, 2016, to February 29, 2016, Defendant Gerald, along with Defendant Bartee and Correctional Housing Unit Manager II Yolanda Gause (also known as Yolanda Jause in prison records), and upon the medical advice of Defendants Sullivan and Bosholm, quarantined these nineteen (19) ill inmates, including Mr. Moreno.

29. This quarantine meant the ill inmates were confined to the top right side of Tan 2 D-Pod, were not permitted to interact with other inmates, were not allowed to go to the chow hall, and received their meals in Tan 2 D-Pod.

30. The quarantined inmates, including Mr. Moreno, were in complete reliance on the prison staff assigned to monitor their medical conditions—*i.e.*, Defendants Bartee, Bett, Brinkley, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter,

9

C. Locklear, T. Locklear, Morse, Ramos, Ramsey, Shaw, Torres, Varnado, J. Warner, and T. Warner. However, Mr. Moreno received no medical care while in quarantine.

31. Between February 26, 2016, and February 29, 2016, Mr. Moreno's condition worsened. After having taken amoxicillin on February 26, 2016, as recklessly prescribed by Defendant Bosholm, Mr. Moreno developed the stereotypical and obvious rash associated with an allergic reaction to amoxicillin around his neck, across his chest and arms, and down his thigh. He became increasingly ill, and by February 29, 2016, he was in acute respiratory failure, in acute renal failure, had hypoxia, and had acidosis. His O2 saturation levels had dropped to 80%, his lips were blue, he was vomiting, his creatinine levels were severely elevated to 5.9, and his LFTs were elevated. Nonetheless, between February 26, 2016, and February 29, 2016, SCI staff did nothing to halt, or even attempt to halt, Mr. Moreno's worsening condition.

32. Between and including February 26, 2016, and February 29, 2016, members of SCI's Medical staff, including Defendants Ramsey, Bett, and Brinkley, periodically came to Tan 2 D-Pod to give medication to the ill inmates and to check their temperatures. However, there is no record of anyone giving any more medication to Mr. Moreno or checking his temperature during that period. Mr. Moreno either was regularly seen or should have been regularly seen by these Medical staff members, and any failure to do so was in reckless disregard of Mr. Moreno's clear medical needs. His vitals were or should have been monitored, and any failure to do so was in reckless disregard of his clear medical needs. Any allergic

10

reaction or worsening of symptoms was or should have been known by these Defendants and should have been promptly treated, and any failure to do so was in reckless disregard of Mr. Moreno's clear medical needs. However, despite Mr. Moreno's worsening condition, Defendants Ramsey, Bett, and Brinkley did nothing to treat Mr. Moreno.

33.     Between and including February 26, 2016, and February 29, 2016, Defendants Bartee, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Morse, Ramos, Shaw, Torres, Varnado, J. Warner, and T. Warner made rounds through Tan 2 D-Pod and checked on the ill inmates, including Mr. Moreno. Any allergic reaction or worsening of symptoms was or should have been known by these Defendants and should have been promptly referred to Medical staff and treated. Any failure to do so was in reckless disregard of Mr. Moreno's clear medical needs. However, despite Mr. Moreno's worsening condition, Defendants Bartee, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Morse, Ramos, Shaw, Torres, Varnado, J. Warner, and T. Warner did nothing to allow Mr. Moreno to receive further treatment.

34.     Though SCI staff refused to do anything to aid Mr. Moreno as his allergic reaction to amoxicillin caused his condition to worsen, the inmates quarantined with Mr. Moreno did try to help him. They could clearly see his serious need for medical care. Accordingly, his fellow inmates continually requested medical care for Mr. Moreno between and including February 26, 2016, and February 29, 2016.

11

Nonetheless, SCI staff ignored their pleas along with ignoring Mr. Moreno's clearly worsening condition.

35.    At or around 10:00 a.m. on February 29, 2016, Defendant Gerald, based on advice from Medical, lifted the quarantine on the purported basis, as NCDPS reported, all inmates had recovered.

36.    Mr. Moreno had not recovered.  On the contrary, by the time the quarantine was lifted, Mr. Moreno was severely and obviously ill, and was only a few hours from sustaining a seizure that would put him in a coma for months.

37.    When the quarantine was lifted, Mr. Moreno's cellmates alerted the correctional officers on duty—Defendants Cruz, Hunt, Locklear, Martinez, and Varnadoe, that he needed immediate treatment.  Defendants Cruz, Hunt, T. Locklear, Martinez, and Varnadoe, however, still did nothing.

38.    Because no one employed at SCI would intervene to aid Mr. Moreno and address his serious medical need, the inmates took Mr. Moreno to Medical at SCI.

39.    Eventually, around 2:00 p.m. on February 29, 2016, a doctor, specifically, Defendant Bosholm, saw Mr. Moreno for the first time since February 26, 2016, and determined that he was in acute respiratory failure, in acute renal failure, had hypoxia, and had acidosis.  His O2 saturation levels were at 80%, his lips were blue, he was vomiting, his creatinine levels were severely elevated to 5.9, and his LFTs were elevated.

40.    Belatedly, after three days of willfully and recklessly ignoring Mr. Moreno's severe illness and need for medical treatment, between 3:00 p.m. and 5:00

p.m. on February 29, 2016, SCI medical staff transferred Mr. Moreno to the emergency department of Scotland Memorial Hospital. However, Mr. Moreno's condition had worsened to such a severe degree by this time, due to Defendants' willful failure to provide him with medical care, that he has not and never will fully recover.

## II. Hospitalization and Coma Due to Defendants' Failure to Provide Medical Care.

41.     At Scotland Memorial Hospital, Mr. Moreno tested positive for H1N1, more commonly known as "swine flu," in addition to having an allergic reaction to amoxicillin.

42.     While in the hospital, Mr. Moreno became increasingly more short of breath, he had a severely elevated heart rate, his platelet levels dropped, and his blood sugars were severely high.

43.     Later that day, on February 29, 2016, Mr. Moreno had a tonic-clonic seizure, one involving a loss of consciousness and violent muscle contractions, and he was subsequently intubated. Mr. Moreno did not awaken at the conclusion of this seizure, but instead remained in a coma for many months.

44.     After his seizure, Mr. Moreno's blood pressure dropped so low that he required a norepinephrine drip, and he repeatedly suffered from spiking fevers.

45.     By the end of the day on February, 29, 2016, Mr. Moreno was put on a ventilator, was in septic shock, had developed pneumonia because his flu symptoms had not been treated properly at SCI, had extremely low blood oxygen levels from pneumonia, was hyperglycemic, and was suffering from multi-organ failure and

13

advanced renal disease due to the recklessly untreated allergic reaction to the recklessly prescribed amoxicillin.

46.     Mr. Moreno's condition became so dire that, on March 2, 2016, Scotland Memorial Hospital transferred him to the Carolinas Medical Center ("CMC") in Charlotte for a higher level of care.  At CMC, Mr. Moreno was put on Keppra for his seizures, was taken off sedation yet remained in a coma, and was treated with dialysis.

47.     Mr. Moreno's health continued to decline, his family was notified and came to his bedside, and he was coded as "Do Not Resuscitate" on March 16, 2016. He remained non-responsive.

48.     On March 22, 2016, Mr. Moreno underwent a tracheostomy, his kidney function continued to worsen, attempts to wean Mr. Moreno from his ventilator failed, he remained febrile, and his platelets levels remained low.   He remained non-responsive.

49.     A repeat CT scan and MRI on April 6, 2016, showed signs of delayed post-hypoxic leukoencephalopathy and diffuse cerebral microhemorrhages consistent with fat emboli, and abnormality of the grey-white differentiation in his brain.  The doctors were unsure whether he would ever come out of his coma.

50.     Mr. Moreno, still in a coma, was then transferred to the ICU at Kindred Hospital in Greensboro on April 8, 2016, for continued care and monitoring.  His diagnoses at Kindred were extensive: acute respiratory failure and ventilator dependency; acute respiratory distress syndrome; influenza virus associated

14

encephalopathy; acute renal failure requiring hemodialysis; recent influenza pneumonias/H1N1; recent severe sepsis; thrombocytophenia; type 2 diabetes; dysphagia with NG tube feeds; seizure disorder; and debility. His prognosis was poor, and doctors thought he would die during his hospitalization.

51.     Throughout his hospitalization at Kindred, Mr. Moreno continued to suffer from spiking high-grade fevers. He was eventually was diagnosed with a drug-resistant klebsiella pneumoniae infection, carbapenem-resistant enterobacteriaceae tracheobronchitis, and staphylococcus aureus tracheobronchitis. He also remained non-responsive and received repeated dialysis. There was so much fluid in his lungs that he required constant suctioning, and he developed bleeding pressure wounds on his legs from the shackles that NCDPS required him to wear even while in a coma.

52.     On May 5, 2016, Mr. Moreno had another seizure and remained non-responsive.

53.     Through May 12, 2016, his vegetative state was considered "persistent."

54.     Miraculously, beginning on June 6, 2016, Mr. Moreno slowly became more and more responsive to verbal commands, though he could not volunteer information and was severely anxious, agitated, and delirious. He had to be restrained because he was trying to pull out his tubes and trying to get out of bed, but he had to remain on the ventilator and receive tube feedings. His prognosis remained guarded through September 2016.

15

55.     On October 11, 2016, Mr. Moreno was able to be transferred to Central Prison. He had significant muscle atrophy in his legs and was unable to stand or walk, and he was severely underweight and protein-deficient, but he was alert.

56.     His treatment and recovery continued at Central Prison for over a year.

57.     Eventually Mr. Moreno regained his weight, regained continence, and eventually was transferred to GCI on December 7, 2017.

58.     However, Mr. Moreno still has not recovered from Defendants' unconstitutional actions.

## III.   Mr. Moreno's Ongoing Health Problems.

59.     The unconstitutional actions of Defendants caused Mr. Moreno significant memory loss and cognitive decline. Mr. Moreno has no memory of ever being sick in February 2016. In fact, he has no memory of the period from February 2016 to around September 2016. Further, he notices a significant cognitive decline from his functioning prior to the coma and today. For example, he struggles to read, stutters, and has a hard time forming words.

60.     The unconstitutional actions of Defendants caused Mr. Moreno significant weight loss. Mr. Moreno was admitted to Scotland Memorial Hospital in February 2016 weighing around 200 pounds. By the time he regained consciousness, he weighed just over 100 pounds.

61.     The unconstitutional actions of Defendants caused Mr. Moreno lifelong mobility issues. Mr. Moreno still has not regained the ability to walk or stand and must use a wheelchair. His muscles are atrophied, his feet are mangled, the tendons

16

in his legs are painfully tight, and he must continually take pain medication. He can only put some weight on his right foot, and he cannot put any weight on his left foot. He can only sleep on the bottom bunk and has an extremely hard time showering. Physical therapy has had minimal impact, if any. He has been told that he must have surgery in order to have even the possibility of walking again, and his physical therapy has been suspended in anticipation of that surgery, but surgery has not been scheduled.

62.     The unconstitutional actions of Defendants caused Mr. Moreno significant weakness in other parts of his body as well. Mr. Moreno's arms and back still are weak. His hands and fingers constantly hurt; he cannot hold smaller items like his utensils and cup for an extended period of time, making it difficult to feed himself; and he can hardly hold a pencil to write. Further, Mr. Moreno's back is in constant pain.

63.     The unconstitutional actions of Defendants caused Mr. Moreno a persistent cough that will not subside, likely from the tracheostomy. Additionally, due to scar tissue, Mr. Moreno's throat always feels tight, which causes difficulty when eating and swallowing.

64.     The unconstitutional actions of Defendants have made it difficult for Mr. Moreno to breathe. His breath is considerably faster than it was prior to the coma, he cannot take a deep breath, and he struggles to catch his breath throughout the night.

65.     The unconstitutional actions of Defendants caused Mr. Moreno significant scarring.  Mr. Moreno has a scar on his abdomen from his feeding tube, which is in constant pain.  Mr. Moreno also has a noticeable scar at the base of his neck from the tracheostomy.

66.     The unconstitutional actions of Defendants caused Mr. Moreno's senses of hearing, vision, smell, and balance ability to decline.  He requires glasses to read, though he did not have issues seeing up close prior to the coma.

67.     The unconstitutional actions of Defendants cause Mr. Moreno to suffer regular urinary tract infections and headaches, which he did not have prior to his hospitalization.

68.     The unconstitutional actions of Defendants also caused Mr. Moreno to suffer psychological harm, emotional harm, and mental anguish.

69.     At SCI, Mr. Moreno took English as a Second Language ("ESL") classes and had a plant job.  He never missed a day of work and was paid around $3.50 per day, or $14.97 per week.

70.     Because of the unconstitutional actions of Defendants, Mr. Moreno was not paid while he was ill, and now he cannot work much all.  He is employed as a janitor assistant and makes only $2.80 per week.  Further, he is no longer taking ESL classes.

## IV.    **The Cover-Up by NCDPS.**

71.     On February 29, 2016, when SCI transferred Mr. Moreno to Scotland Memorial Hospital, Defendants Bosholm and Sullivan misrepresented to the hospital

18

staff about the inadequate and reckless medical care they provided to Mr. Moreno at SCI. They reported to the hospital that Mr. Moreno had been prescribed amoxicillin but had not yet started on it. They did so despite prison records indicating that Mr. Moreno had received <u>and had taken</u> amoxicillin on February 26, 2016, and despite Mr. Moreno's presentation of the stereotypical rash associated with an amoxicillin allergy when he arrived at Scotland Memorial Hospital.

72.     Defendants Bosholm and Sullivan also reported to the hospital on February 29, 2016, that Mr. Moreno had no known allergies. On March 3, 2016, Defendant Bosholm went so far as to doctor Mr. Moreno's prison medical records to state that "[n]o allergy to Amoxicillin was indicated."

73.     On the other hand, Scotland Memorial Hospital recorded that Mr. Moreno had "a documented allergy to amoxicillin" on February 29, 2016, indicating that this allergy was documented prior to February 29, 2016, when Mr. Moreno was still in the care of Defendants. This documentation in the hospital records fortunately prevented Mr. Moreno from receiving amoxicillin when he developed multiple and severe infections during his nearly eight-month hospitalization.

74.     For nearly eight months, hospital records indicated and documented Mr. Moreno's amoxicillin allergy. However, when Mr. Moreno was transferred back to the prison system in October 2016, the doctor at the prison, Defendant Ahmed, recorded in Mr. Moreno's chart that Mr. Moreno had no known drug allergies.

75.     This notation was made in an effort to continue to pretend that NCDPS had no idea that Mr. Moreno had an amoxicillin allergy.

19

76.     By Defendant Ahmed failing to note Mr. Moreno's life-threatening and known allergy to amoxicillin, he has put Mr. Moreno at high risk for being prescribed amoxicillin and another severe allergic reaction to amoxicillin.

## V.     Exhaustion of Administrative Remedies.

77.     Following Mr. Moreno's hospitalization, Mr. Moreno's father, Valerino Castaneda, requested and obtained Mr. Moreno's hospital records to send to Mr. Moreno.

78.     Mr. Castaneda sent them once, but NCDPS, through Defendant Cobb or by his direction, stated Mr. Moreno could not have his own medical records and required Mr. Moreno to pay to return them to Mr. Castaneda without Mr. Moreno ever receiving them.

79.     Mr. Castaneda sent them a second time, but NCDPS through Defendant Cobb or by his direction, required Mr. Moreno to pay to return them to Mr. Castaneda without Mr. Moreno ever receiving them.

80.     Mr. Castaneda sent them a third time, and Mr. Moreno was able to receive the medical records, which were over 3,000 pages.

81.     The records were in English, and Mr. Moreno is not a proficient English speaker.  However, with considerable effort and assistance by fellow inmates, Mr. Moreno read his medical records and learned, for the first time, of some of the Defendants' unconstitutional actions and their consequences, as described above.

82.     In late 2018, while at Central Prison for a medical appointment, Mr. Moreno serendipitously met an inmate who had been housed at SCI with Mr. Moreno

in 2016. This inmate explained to Mr. Moreno the illness he suffered in February 2016, the lack of action by some or all of the Defendants despite Mr. Moreno's obvious worsening and life-threatening condition, the lack of action by the Defendants despite several inmates pleading with some or all of the Defendants that medical care be rendered to Mr. Moreno, and that the inmates at SCI assumed Mr. Moreno had died when he did not return to SCI considering Mr. Moreno's grievous condition when he was transported to Scotland Memorial.

83.    On or about February 27, 2019, Mr. Moreno then submitted a written grievance regarding the foregoing unconstitutional actions of Defendants.

84.    Mr. Moreno's grievance was summarily rejected without any consideration by NCDPS because, according to the rejection notice, his grievance was submitted more than ninety (90) days after the foregoing actions of Defendants occurred.

85.    Mr. Moreno was in a coma for the ninety-day period following the Defendants' unconstitutional actions; had no recollection of the events; and never returned to SCI, where his fellow inmates were housed and could have explained to him what had happened. He was entirely unable to submit a grievance during that period. It was not until Mr. Moreno received his medical records, went through the arduous task of reading them, and encountered a former cellmate that he had any idea of Defendants' unconstitutional records.

21

## FIRST CAUSE OF ACTION
## VIOLATION OF CIVIL RIGHTS [42 U.S.C. § 1983]
**(By Plaintiff Against Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner)**

86.    Mr. Moreno hereby incorporates and realleges the foregoing Paragraphs of this First Amended Complaint as though fully set forth herein.

87.    Plaintiff's medical condition when he presented at SCI Medical on February 26, 2016, was an objectively serious medical condition because it was diagnosed by Defendant Bosholm as mandating treatment.

88.    However, on February 26, 2019, Defendant Bosholm showed deliberate indifference to his serious medical need, because she failed to render medical treatment.  Defendant Bosholm knew Mr. Moreno had the flu and had actual or constructive notice that he was allergic to amoxicillin.  She failed to reasonably respond to Mr. Moreno's flu symptoms and amoxicillin allergy in that she recklessly prescribed Plaintiff amoxicillin despite his known allergy and despite knowing that Plaintiff had the flu—a virus, not a bacterial infection treatable by amoxicillin. Defendant Bosholm indeed rendered no medical treatment for the flu to Mr. Moreno and instead ordered him to be quarantined.

89.    Defendant Bosholm's failure to treat Mr. Moreno could and did result in further significant and unnecessary injury.

90.    Plaintiff's medical condition from February 26, 2016, to February 29, 2016, was an objectively serious medical condition.  By the time Plaintiff finally was treated at Scotland Memorial Hospital, he was in acute respiratory failure, was in

22

acute renal failure and suffered advanced renal disease, suffered from multi-organ failure, had hypoxia, had acidosis, had pneumonia, had severely elevated creatinine levels and LFTs, had severely depressed O2 saturation levels, had a severely elevated heart rate and blood sugars, had severely low platelet levels, and eventually had a tonic-clonic seizure that day, leading to septic shock and a nearly four-month coma. His condition was so obvious that even a lay person would perceive the need for immediate medical care—and lay persons did so perceive, as Mr. Moreno's fellow inmates pleaded with the SCI staff to care for Mr. Moreno, to no avail.

91.    Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner were personally and directly involved in providing treatment to and monitoring Mr. Moreno from February 26, 2016, to February 29, 2016.    Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner knew Mr. Moreno's condition was drastically worsening.  They failed to reasonably respond to his condition in that they did nothing to render medical care to him.    Such defendants showed deliberate indifference to Mr. Moreno's increasingly serious medical need and provided no treatment to Mr. Moreno during this time.

92.    Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw,

Sullivan, Torres, Varnado, J. Warner, and T. Warner failure to treat Mr. Moreno could and did result in further significant and unnecessary injury.

93.    In violation of the Eighth Amendment to the United States Constitution, as incorporated to the states through the Fourteenth Amendment, Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner were aware of and deliberately indifferent to the dangerousness of Mr. Moreno's serious conditions from February 26, 2016, through February 29, 2016, as described in more detail above.  They knew of a substantial risk of harm to Mr. Moreno but disregarded that risk.  The deliberate indifference of and reckless disregard by Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner manifested itself in the following ways:

      a.  Defendants Sullivan and Bosholm prescribed and allowed Mr. Moreno to take amoxicillin despite knowledge of his amoxicillin allergy;

      b.  Defendants Sullivan and Bosholm failed to prescribe the medication necessary to treat Mr. Moreno's actual condition, or otherwise treat his actual condition, despite knowing that Mr. Moreno had the flu;

      c.  Defendants Sullivan and Bosholm failed to adequately monitor Mr. Moreno after he presented at SCI Medical with a serious medical condition despite knowledge that Mr. Moreno had an amoxicillin allergy

24

and had taken amoxicillin at the direction of Defendant Bosholm, and despite knowledge of Mr. Moreno's need for medical care for the flu;

d. Defendant Bosholm created the policy to quarantine Defendant Moreno where he was unable to access further medical care on his own volition or with his fellow inmates' assistance;

e. Defendants Sullivan and Bosholm delayed providing Mr. Moreno with necessary medical treatments from February 26, 2016, to February 29, 2016, despite having knowledge of his need for immediate medical care due to his rapidly worsening condition that ultimately led to Mr. Moreno succumbing to a four-month coma on February 29, 2016;

f. Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner made rounds through Tan 2 D-Pod and checked on the ill inmates, including Mr. Moreno, and due to the obvious and serious nature of Mr. Moreno's condition could identify that Mr. Moreno needed immediate medical attention, but failed to report and treat Mr. Moreno's worsening condition and obvious amoxicillin allergic reaction;

g. Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner

25

intentionally denied or delayed Mr. Moreno's access to treatment for his worsening condition;

h. Despite pleas from Mr. Moreno's fellow inmates, Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner refused to have Mr. Moreno returned to SCI Medical, or an outside medical provider, for further assessment and treatment, from February 26, 2016, to February 29, 2016;

i. Defendants Cruz, Hunt, T. Locklear, Martinez, and Varnado refused to take Mr. Moreno to SCI Medical on February 29, 2016, once the quarantine was lifted, despite pleas by Mr. Moreno's fellow inmates; and

j. In further ways to be adduced through discovery and at trial.

94. A reasonable person in Defendants' position would know that the actions described above were unconstitutional.

95. As a result of Defendants' deliberate indifference to Mr. Moreno's objectively serious medical condition, Mr. Moreno has suffered physical and emotional harm, lost wages, medical expenses, and pain and suffering, as described in detail above.

26

## SECOND CAUSE OF ACTION
## NEGLIGENCE AND GROSS NEGLIGENCE
**(By Plaintiff Against Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner)**

96.     Mr. Moreno hereby incorporates and realleges the foregoing Paragraphs of this First Amended Complaint as though fully set forth herein.

97.     Prisons and prison officials owe a duty to prisoners, including Mr. Moreno, to provide adequate medical care.

98.     As Mr. Moreno's treating physician, Defendant Bosholm owed Mr. Moreno a duty of care of a reasonable medical provider.

99.     Defendant Bosholm breached this duty of care on February 26, 2019, when she recklessly failed to render medical treatment for the flu and recklessly prescribed Mr. Moreno amoxicillin despite his known allergy.

100.     Defendant Bosholm's failure to treat Mr. Moreno could and did result in further significant and unnecessary injury.

101.     Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner owed a duty of care to Mr. Moreno.  They were personally and directly responsible to provide treatment to and monitor Mr. Moreno from February 26, 2016, to February 29, 2016.

102.     Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner breached their duty of care

27

when they knew Mr. Moreno's condition was drastically worsening and failed to reasonably respond to such in that they did nothing to render medical care to him. Such defendants showed deliberate indifference to Mr. Moreno's increasingly serious medical need and provided no treatment to Mr. Moreno during this time.

103.    Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner failure to treat Mr. Moreno could and did result in further significant and unnecessary injury.

## THIRD CAUSE OF ACTION
### VIOLATION OF CIVIL RIGHTS [42 U.S.C. § 1983]
### (By Plaintiff Against Defendant Ahmed)

104.    Mr. Moreno hereby incorporates and realleges the foregoing Paragraphs of this First Amended Complaint as though fully set forth herein.

105.    In violation of the Eighth Amendment to the United States Constitution, as incorporated to the states through the Fourteenth Amendment, Defendant Ahmed was aware of and deliberately indifferent to Mr. Moreno's known and documented severe allergy to amoxicillin and the impact taking even one dose of amoxicillin has on Mr. Moreno.  By failing to document Mr. Moreno's known severe allergy to amoxicillin, he put Mr. Moreno at substantial and unreasonable risk of serious harm, *i.e.*, a strong likelihood of death or serious and prolonged illness as a result of another prison doctor prescribing amoxicillin to Mr. Moreno.  The medical records Defendant Ahmed received from the private hospitals clearly indicated Mr. Moreno's known drug allergy, and even a cursory review of Mr. Moreno's medical records would have

28

revealed to Defendant Ahmed Mr. Moreno's known drug allergy. Defendant Ahmed knew of a substantial risk of harm to Mr. Moreno but disregarded that risk when he recorded in Mr. Moreno's NCDPS medical chart that Mr. Moreno had no known drug allergies, as Mr. Moreno was returning to medical care in NCDPS having been in a four-month coma due to a documented amoxicillin allergic reaction.

106.    A reasonable person in Defendant Ahmed's position would know that the actions described above were unconstitutional.

107.    As a result of Defendant Ahmed's deliberate indifference to Mr. Moreno's known and documented severe allergy to amoxicillin, Mr. Moreno likely will suffer severe physical and emotional harm, *i.e.*, a strong likelihood of death or serious and prolonged illness as a result of another prison doctor prescribing amoxicillin to Mr. Moreno, if Defendant Ahmed, in his official capacity, is not enjoined.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS [42 U.S.C. § 1983]**
**(By Plaintiff Against Defendant Cobb)**

108.    Mr. Moreno hereby incorporates and realleges the foregoing Paragraphs of this First Amended Complaint as though fully set forth herein.

109.    In violation of the First Amendment to the United States Constitution, as incorporated to the states through the Fourteenth Amendment, Defendant Cobb censored Mr. Moreno's incoming mail from his father without any reasonable relationship to any legitimate government interest. There is no penological interest to restrict Mr. Moreno's right to his own medical records. Instead, Defendant Cobb's censorship was done only because of the content of the mail—Defendant Cobb

rejected Mr. Moreno's mail because it was essential to Mr. Moreno bringing a cause of action against NCDPS employees.

110. Mr. Cobb's censorship of Mr. Moreno's mail is in direct violation of NCDPS policies: The mail did not contain threats of physical violence, contain threats of blackmail or extortion, concern sending contraband, concern plans to escape, concern plans to violate departmental rules and policies, concern plans for criminal activity, concern information that would create a clear and present danger of violence and physical harm, contain sexually explicit material, or contain photographs which would support gang activity. They were simply Mr. Moreno's medical records.

111. A reasonable person in Defendant Cobb's position would know that the actions described above were unconstitutional.

112. As a result of Defendant Cobb's reckless disregard of Mr. Moreno's rights, Mr. Moreno suffered financial harm and delay of his case, and likely will continue to suffer harm if Mr. Cobb, in his official capacity, is not enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby demands a trial by jury in this action on all claims so triable and respectfully prays the Court for judgment as follows:

    a. Damages in an amount to be determined at trial;

    b. Injunctive relief to remove Plaintiff's substantial risk of receiving another lethal dose of amoxicillin;

    c. Injunctive relief to prevent prison officials from unconstitutionally censoring Mr. Moreno's mail;

d.  Punitive damages against all Defendants for their reckless and callous indifference to Plaintiff's rights;

e.  A judgment awarding Plaintiff his costs, disbursements, pre- and post-judgment interest, and attorneys' fees; and

f.  Such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 16th day of March, 2020.

/s/ Sarah M. Saint
Sarah M. Saint
  ssaint@brookspierce.com
  NC State Bar No. 52586
Kearns Davis
  kdavis@brookspierce.com
  NC State Bar No. 22014

BROOKS, PIERCE, McLENDON,
  HUMPHREY & LEONARD, L.L.P.
2000 Renaissance Plaza
230 North Elm Street (27401)
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone:  (336) 373-8850
Facsimile:   (336) 378-1001

*Attorneys for Plaintiff*

31

## CERTIFICATE OF SERVICE

I hereby certify that on date indicated below I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the attorneys of record.

This the 16th day of March, 2020.

/s/ Sarah M. Saint
Sarah M. Saint
N.C. State Bar No. 52586
Email:       ssaint@brookspierce.com
BROOKS, PIERCE, McLENDON,
  HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone:  (336) 373-8850
Facsimile:   (336) 378-1001

*Attorney for Plaintiff*