# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MANUEL MORENO,               )
                             )
            Plaintiff,       )
                             )
      v.                     )        1:19cv360
                             )
SHAZAD AHMED, et al.,        )
                             )
            Defendants.      )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion for Summary Judgment of Defendant Dr. Carol C. Bosholm" (Docket Entry 116) (the "Motion").[1] For the reasons that follow, the Court should grant in part and deny in part the Motion.

## BACKGROUND

Alleging negligence and deliberate indifference to his serious medical needs during his incarceration at Scotland Correctional Institution ("SCI" or "Scotland"), Manuel Moreno (at times, the "Plaintiff") sued, among others, Dr. Carol Bosholm (at times, the "Defendant" or "Dr. Bosholm"). (See Docket Entry 17 (the "Amended Complaint") at 1-31.)[2]

_____

[1] For legibility reasons, this Opinion omits all-cap and bold font in all quotations from the parties' materials.

[2] Docket Entry page citations utilize the CM/ECF footer's pagination.

## I. Plaintiff's Allegations

As relevant to the Motion, the Amended Complaint alleges:

Dr. Bosholm "was a Physician for SCI and was an employee of the State of North Carolina at all times relevant to this case." (Id., ¶ 9.) "[Dr.] Bosholm, as physician for SCI, had the professional responsibility and duty to ensure and provide the proper medical care to prisoners." (Id.) Heather Sullivan served as a lead nurse at SCI (id., ¶ 11), and Josh Brinkley and Japeth Bett likewise served as nurses at SCI (id., ¶ 12). "Prior to February 2016, [Plaintiff] was extremely healthy. His only health concerns were psoriasis, gastro-esophageal reflux disease . . ., and an unspecified nail disorder." (Id., ¶ 17.) However:

> According to Scotland Memorial Hospital records, [Plaintiff] had a documented allergy to amoxicillin. A common allergic reaction to amoxicillin known to all competent medical providers is a maculopapular rash, typically around the neck and chest area. Fatal anaphylaxis is another allergic reaction to amoxicillin known to all competent medical providers, which, when not properly treated, can lead to acute renal failure, seizures, coma, and death.

(Id., ¶ 18.)

"On February 26, 2016, between around 6:00 p.m. and 8:00 p.m., [Plaintiff], along with eighteen (18) other inmates housed on Tan 2 D-Pod at SCI, went to the Health Service department ('Medical') at SCI for flu-like symptoms." (Id., ¶ 20.) "Sullivan assessed the nineteen (19) ill inmates, including [Plaintiff]; deemed them contagious; and forwarded their charts to [Dr.] Bosholm." (Id.,

2

¶ 21.) "[Plaintiff] had exhibited flu-like symptoms for the previous five days, including a sore throat, body aches, sinus pain and pressure, coughing up green sputum, cough, and sinus congestion. [Dr.] Bosholm diagnosed [Plaintiff] with acute pharyngitis, a painful throat condition often associated with [the] flu, and noted his flu-like symptoms." (Id., ¶ 22.) "[Plaintiff] relied on [Dr.] Bosholm to treat his medical needs. However, she did not." (Id., ¶ 23.) "Confusingly, [Dr.] Bosholm prescribed [Plaintiff] amoxicillin — an antibiotic used to treat bacterial infections, even though the flu is a viral infection — in reckless disregard to [Plaintiff's] documented allergy to amoxicillin and need for flu medication." (Id., ¶ 24.) "Amoxicillin is not approved for treating the flu. Selecting it as a treatment was and is medically unacceptable in light of [Plaintiff's] circumstances, and choosing to prescribe it for [Plaintiff] was and is in conscious disregard of an excessive risk to [Plaintiff's] health." (Id.) "[Plaintiff] took the amoxicillin as directed by [Dr.] Bosholm." (Id., ¶ 25.) "[Dr.] Bosholm did not give [Plaintiff] any flu medication, such as Tamiflu, or an anti-viral, in reckless disregard of his clear need for such medication." (Id., ¶ 26.) "Once [Dr.] Bosholm gave [Plaintiff] amoxicillin, she sent him back to Tan 2 D-Pod with the other ill inmates, where he would receive no further medical care until he was hours away from a coma on February 29, 2016." (Id., ¶ 27.)

3

"From February 26, 2016, to February 29, 2016," various prison personnel, "upon the medical advice of Defendants Sullivan and Bosholm, quarantined these nineteen (19) ill inmates, including [Plaintiff]." (Id., ¶ 28.) "This quarantine meant the ill inmates were confined to the top right side of Tan 2 D-Pod, were not permitted to interact with other inmates, were not allowed to go to the chow hall, and received their meals in Tan 2 D-Pod." (Id., ¶ 29.) "The quarantined inmates, including [Plaintiff], were in complete reliance on the prison staff assigned to monitor their medical conditions . . . . However, [Plaintiff] received no medical care while in quarantine." (Id., ¶ 30.) Moreover:

> Between February 26, 2016, and February 29, 2016, [Plaintiff's] condition worsened. After having taken amoxicillin on February 26, 2016, as recklessly prescribed by [Dr.] Bosholm, [Plaintiff] developed the stereotypical and obvious rash associated with an allergic reaction to amoxicillin around his neck, across his chest and arms, and down his thigh. He became increasingly ill, and by February 29, 2016, he was in acute respiratory failure, in acute renal failure, had hypoxia, and had acidosis. His [oxygen (at times, "O2")] saturation levels had dropped to 80%, his lips were blue, he was vomiting, his creatinine levels were severely elevated to 5.9, and his LFTs were elevated. Nonetheless, between February 26, 2016, and February 29, 2016, SCI staff did nothing to halt, or even attempt to halt, [Plaintiff's] worsening condition.

> Between and including February 26, 2016, and February 29, 2016, members of SCI's Medical staff, including Defendants Ramsey, Bett, and Brinkley, periodically came to Tan 2 D-Pod to give medication to the ill inmates and to check their temperatures. However, there is no record of anyone giving any more medication to [Plaintiff] or checking his temperature during that period. [Plaintiff] either was regularly seen or should have been regularly seen by these Medical

4

staff members, and any failure to do so was in reckless disregard of [Plaintiff's] clear medical needs. His vitals were or should have been monitored, and any failure to do so was in reckless disregard of his clear medical needs. Any allergic reaction or worsening of symptoms was or should have been known by these Defendants and should have been promptly treated, and any failure to do so was in reckless disregard of [Plaintiff's] clear medical needs. However, despite [Plaintiff's] worsening condition, Defendants Ramsey, Bett, and Brinkley did nothing to treat [Plaintiff].

Between and including February 26, 2016, and February 29, 2016, Defendants Bartee, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Morse, Ramos, Shaw, Torres, Varnado, J. Warner, and T. Warner made rounds through Tan 2 D-Pod and checked on the ill inmates, including [Plaintiff]. Any allergic reaction or worsening of symptoms was or should have been known by these Defendants and should have been promptly referred to Medical staff and treated. Any failure to do so was in reckless disregard of [Plaintiff's] clear medical needs. However, despite [Plaintiff's] worsening condition, Defendants Bartee, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Morse, Ramos, Shaw, Torres, Varnado, J. Warner, and T. Warner did nothing to allow [Plaintiff] to receive further treatment.

Though SCI staff refused to do anything to aid [Plaintiff] as his allergic reaction to amoxicillin caused his condition to worsen, the inmates quarantined with [Plaintiff] did try to help him. They could clearly see his serious need for medical care. Accordingly, his fellow inmates continually requested medical care for [Plaintiff] between and including February 26, 2016, and February 29, 2016. Nonetheless, SCI staff ignored their pleas along with ignoring [Plaintiff's] clearly worsening condition.

(Id., ¶¶ 31–34 (internal paragraph numbering omitted).)

"At or around 10:00 a.m. on February 29, 2016, Defendant Gerald, based on advice from Medical, lifted the quarantine on the purported basis, as [the North Carolina Department of Public Safety

5

(the 'NCDPS')] reported, [that] all inmates had recovered." (Id., ¶ 35.) "[Plaintiff] had not recovered. On the contrary, by the time the quarantine was lifted, [Plaintiff] was severely and obviously ill, and was only a few hours from sustaining a seizure that would put him in a coma for months." (Id., ¶ 36.) "When the quarantine was lifted, [Plaintiff's] cellmates alerted the correctional officers on duty . . . that he needed immediate treatment. [The correctional officers,] however, still did nothing." (Id., ¶ 37.) "Because no one employed at SCI would intervene to aid [Plaintiff] and address his serious medical need, the inmates took [Plaintiff] to Medical at SCI." (Id., ¶ 38.) "Eventually, around 2:00 p.m. on February 29, 2016, a doctor, specifically, [Dr.] Bosholm, saw [Plaintiff] for the first time since February 26, 2016, and determined that he was in acute respiratory failure, in acute renal failure, had hypoxia, and had acidosis. His O2 saturation levels were at 80%, his lips were blue, he was vomiting, his creatinine levels were severely elevated to 5.9, and his LFTs were elevated." (Id., ¶ 39.)

"Belatedly, after three days of willfully and recklessly ignoring [Plaintiff's] severe illness and need for medical treatment, between 3:00 p.m. and 5:00 p.m. on February 29, 2016, SCI medical staff transferred [Plaintiff] to the emergency department of Scotland Memorial Hospital. However, [Plaintiff's] condition had worsened to such a severe degree by this time, due to

6

Defendants' willful failure to provide him with medical care, that he has not and never will fully recover." (Id., ¶ 40.) "At Scotland Memorial Hospital, [Plaintiff] tested positive for H1N1, more commonly known as 'swine flu,' in addition to having an allergic reaction to amoxicillin." (Id., ¶ 41.)[3] "While in the hospital, [Plaintiff] became increasingly more short of breath, he had a severely elevated heart rate, his platelet levels dropped, and his blood sugars were severely high." (Id., ¶ 42.)

"Later that day, on February 29, 2016, [Plaintiff] had a tonic-clonic seizure, one involving a loss of consciousness and violent muscle contractions, and he was subsequently intubated. [Plaintiff] did not awaken at the conclusion of this seizure, but

_____

3   "[W]hen SCI transferred [Plaintiff] to Scotland Memorial Hospital, [Dr.] Bosholm and Sullivan misrepresented to the hospital staff about the inadequate and reckless medical care they provided to [Plaintiff] at SCI.   They reported to the hospital that [Plaintiff] had been prescribed amoxicillin but had not yet started on it."   (Id., ¶ 71.)   "They did so despite prison records indicating that [Plaintiff] had received and had taken amoxicillin on February 26, 2016, and despite [Plaintiff's] presentation of the stereotypical rash associated with an amoxicillin allergy when he arrived at Scotland Memorial Hospital."   (Id. (emphasis in original).)   They "also reported to the hospital on February 29, 2016, that [Plaintiff] had no known allergies.   On March 3, 2016, [Dr.] Bosholm went so far as to doctor [Plaintiff's] prison medical records to state that '[n]o allergy to Amoxicillin was indicated.'" (Id., ¶ 72 (brackets in original).)   "On the other hand, Scotland Memorial Hospital recorded that [Plaintiff] had 'a documented allergy to amoxicillin' on February 29, 2016, indicating that this allergy was documented prior to February 29, 2016, when [Plaintiff] was still in the care of Defendants."   (Id., ¶ 73.)   "This documentation in the hospital records fortunately prevented [Plaintiff] from receiving amoxicillin when he developed multiple and severe infections during his nearly eight-month hospitalization."   (Id.)

instead remained in a coma for many months." (Id., ¶ 43.) "After
his seizure, [Plaintiff's] blood pressure dropped so low that he
required a norepinephrine drip, and he repeatedly suffered from
spiking fevers." (Id., ¶ 44.) "By the end of the day on
February[] 29, 2016, [Plaintiff] was put on a ventilator, was in
septic shock, had developed pneumonia because his flu symptoms had
not been treated properly at SCI, had extremely low blood oxygen
levels from pneumonia, was hyperglycemic, and was suffering from
multi-organ failure and advanced renal disease due to the
recklessly untreated allergic reaction to the recklessly prescribed
amoxicillin." (Id., ¶ 45.) "[Plaintiff's] condition became so
dire that, on March 2, 2016, Scotland Memorial Hospital transferred
him to the Carolinas Medical Center ('CMC') in Charlotte for a
higher level of care. At CMC, [Plaintiff] was put on Keppra for
his seizures, was taken off sedation yet remained in a coma, and
was treated with dialysis." (Id., ¶ 46.) Plaintiff's condition
continued to deteriorate, resulting in a months-long coma and
extensive medical interventions and impairments, as well as lengthy
hospitalizations and ongoing serious medical impairments,
psychological harm, and mental and physical limitations. (Id.,
¶¶ 47-70.)

    Of particular note:

    The unconstitutional actions of Defendants caused
    [Plaintiff] significant memory loss and cognitive
    decline. [Plaintiff] has no memory of ever being sick in
    February 2016. In fact, he has no memory of the period

8

from February 2016 to around September 2016. Further, he notices a significant cognitive decline from his functioning prior to the coma and today. For example, he struggles to read, stutters, and has a hard time forming words.

(Id., ¶ 59.)

"Plaintiff's medical condition when he presented at SCI Medical on February 26, 2016, was an objectively serious medical condition because it was diagnosed by [Dr.] Bosholm as mandating treatment." (Id., ¶ 87.) "However, on February 26, 2019, [Dr.] Bosholm showed deliberate indifference to his serious medical need, because she failed to render medical treatment. [Dr.] Bosholm knew [Plaintiff] had the flu and had actual or constructive notice that he was allergic to amoxicillin." (Id., ¶ 88.) "She failed to reasonably respond to [Plaintiff's] flu symptoms and amoxicillin allergy in that she recklessly prescribed Plaintiff amoxicillin despite his known allergy and despite knowing that Plaintiff had the flu — a virus, not a bacterial infection treatable by amoxicillin." (Id.) "[Dr.] Bosholm indeed rendered no medical treatment for the flu to [Plaintiff] and instead ordered him to be quarantined." (Id.) "[Dr.] Bosholm's failure to treat [Plaintiff] could and did result in further significant and unnecessary injury." (Id., ¶ 89.)

Furthermore:

Plaintiff's medical condition from February 26, 2016, to February 29, 2016, was an objectively serious medical condition. By the time Plaintiff finally was treated at Scotland Memorial Hospital, he was in acute

9

respiratory failure, was in acute renal failure and suffered advanced renal disease, suffered from multi-organ failure, had hypoxia, had acidosis, had pneumonia, had severely elevated creatinine levels and LFTs, had severely depressed O2 saturation levels, had a severely elevated heart rate and blood sugars, had severely low platelet levels, and eventually had a tonic-clonic seizure that day, leading to septic shock and a nearly four-month coma. His condition was so obvious that even a lay person would perceive the need for immediate medical care — and lay persons did so perceive, as [Plaintiff's] fellow inmates pleaded with the SCI staff to care for [Plaintiff], to no avail.

(Id., ¶ 90.)

Dr. Bosholm "w[as] personally and directly involved in providing treatment to and monitoring [Plaintiff] from February 26, 2016, to February 29, 2016." (Id., ¶ 91.) She and other defendants "knew [Plaintiff's] condition was drastically worsening. They failed to reasonably respond to his condition in that they did nothing to render medical care to him. Such defendants showed deliberate indifference to [Plaintiff's] increasingly serious medical need and provided no treatment to [Plaintiff] during this time." (Id.) Their "failure to treat [Plaintiff] could and did result in further significant and unnecessary injury." (Id., ¶ 92.) They "were aware of and deliberately indifferent to the dangerousness of [Plaintiff's] serious conditions from February 26, 2016, through February 29, 2016, as described in more detail above. They knew of a substantial risk of harm to [Plaintiff] but disregarded that risk." (Id., ¶ 93.)

10

This "deliberate indifference [] and reckless disregard . . . manifested itself in[, inter alia,] the following ways" (id.):

a. Defendants Sullivan and Bosholm prescribed and allowed [Plaintiff] to take amoxicillin despite knowledge of his amoxicillin allergy;

b. Defendants Sullivan and Bosholm failed to prescribe the medication necessary to treat [Plaintiff's] actual condition, or otherwise treat his actual condition, despite knowing that [Plaintiff] had the flu;

c. Defendants Sullivan and Bosholm failed to adequately monitor [Plaintiff] after he presented at SCI Medical with a serious medical condition despite knowledge that [Plaintiff] had an amoxicillin allergy and had taken amoxicillin at the direction of [Dr.] Bosholm, and despite knowledge of [Plaintiff's] need for medical care for the flu;

d. [Dr.] Bosholm created the policy to quarantine [Plaintiff] where he was unable to access further medical care on his own volition or with his fellow inmates' assistance;

e. Defendants Sullivan and Bosholm delayed providing [Plaintiff] with necessary medical treatments from February 26, 2016, to February 29, 2016, despite having knowledge of his need for immediate medical care due to his rapidly worsening condition that ultimately led to [Plaintiff] succumbing to a four-month coma on February 29, 2016;

f. Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner made rounds through Tan 2 D-Pod and checked on the ill inmates, including [Plaintiff], and due to the obvious and serious nature of [Plaintiff's] condition could identify that [Plaintiff] needed immediate medical attention, but failed to report and treat [Plaintiff's] worsening condition and obvious amoxicillin allergic reaction;

g. Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan,

11

Torres, Varnado, J. Warner, and T. Warner intentionally denied or delayed [Plaintiff's] access to treatment for his worsening condition; [and]

h. Despite pleas from [Plaintiff's] fellow inmates, Defendants Bartee, Bett, Bosholm, Chavis, Cruz, Edwards, Harris, Hunt, Kerstetter, C. Locklear, T. Locklear, Martinez, Morse, Ramos, Ramsey, Shaw, Sullivan, Torres, Varnado, J. Warner, and T. Warner refused to have [Plaintiff] returned to SCI Medical, or an outside medical provider, for further assessment and treatment, from February 26, 2016, to February 29, 2016[.]

(Id.)

"A reasonable person in Defendants' position would know that the actions described above were unconstitutional." (Id., ¶ 94.) "As a result of Defendants' deliberate indifference to [Plaintiff's] objectively serious medical condition, [Plaintiff] has suffered physical and emotional harm, lost wages, medical expenses, and pain and suffering, as described in detail [in the Amended Complaint]." (Id., ¶ 95.)

"Prisons and prison officials owe a duty to prisoners, including [Plaintiff], to provide adequate medical care." (Id., ¶ 97.) "As [Plaintiff's] treating physician, [Dr.] Bosholm owed [Plaintiff] a duty of care of a reasonable medical provider." (Id., ¶ 98.) "[Dr.] Bosholm breached this duty of care on February 26, 2019, when she recklessly failed to render medical treatment for the flu and recklessly prescribed [Plaintiff] amoxicillin despite his known allergy." (Id., ¶ 99.) "[Dr.] Bosholm's failure to treat [Plaintiff] could and did result in further significant and unnecessary injury." (Id., ¶ 100.) Dr. Bosholm and other

12

defendants "owed a duty of care to [Plaintiff]. They were personally and directly responsible to provide treatment to and monitor [Plaintiff] from February 26, 2016, to February 29, 2016." (Id., ¶ 101.) They "breached their duty of care when they knew [Plaintiff's] condition was drastically worsening and failed to reasonably respond to such in that they did nothing to render medical care to him." (Id., ¶ 102.) "Such defendants showed deliberate indifference to [Plaintiff's] increasingly serious medical need and provided no treatment to [Plaintiff] during this time." (Id.) Their "failure to treat [Plaintiff] could and did result in further significant and unnecessary injury." (Id., ¶ 103.)

## II.  Prior Rulings & Procedural History

Multiple defendants moved to dismiss the Amended Complaint. (See, e.g., Docket Entry 66 (the "Recommendation") at 1.) In resolving the dismissal motions, the Court rejected the argument that North Carolina Rule of Civil Procedure 9(j) ("N.C. Rule 9(j)") applied to Plaintiff's federal action. (See id. at 23-24, 39-42; see also Docket Entry 79 at 1 (adopting Recommendation).) The Court further noted that part of Plaintiff's negligence claims against Dr. Bosholm sound in medical malpractice. (See Docket Entry 66 at 41-42 (observing that Plaintiff "alleged that [Dr.] Bosholm failed to make appropriate 'medical decision[s] requiring clinical judgment and intellectual skill'" (final set of brackets

13

in original)).)[4]   The Court also held that, independent of his
medical malpractice claim, Plaintiff "stated a viable claim against
[Dr.] Bosholm [and other defendants] for their allegedly negligent
failure to obtain prompt medical care for Plaintiff in response to
his obvious medical need" (id. at 41).  (See id. at 40 (explaining
that Plaintiff alleged that Dr. Bosholm and others "owed a duty to
treat and monitor Plaintiff and that they breached such duty 'when
they knew [Plaintiff]'s condition was drastically worsening and
failed to reasonably respond to such in that they did nothing to
render medical care to him'" (citation omitted) (brackets in
original) (first citing Docket Entry 17, ¶ 101; then quoting id.,
¶ 102)).)

     The parties proceeded to discovery (see, e.g., Docket Entry
100 (discussing discovery and discovery deadlines)), after which
Dr. Bosholm filed the Motion (see Docket Entry 116) and a brief in
support thereof (Docket Entry 117) (the "Supporting Memorandum").
Plaintiff responded in opposition thereto (see Docket Entry 119)
(the "Response"), and Dr. Bosholm replied (see Docket Entry 123)
(the "Reply").

_____

     4    The Court further observed, however, that Plaintiff's
allegations regarding the prescription of amoxicillin
notwithstanding his known allergy thereto "involve[] negligence
that a jury could infer based on 'common knowledge and
experience.'"  (Id. at 42 n.21.)

14

### III.  Plaintiff's Discovery Responses and Testimony

Plaintiff retains no memory of the events underlying this action (see, e.g., Docket Entry 120-1 at 10-14) and thus "do[es] not remember" "Dr. Bosholm's role or any treatment that she gave [him] when [he] got sick in February of 2016" (id. at 27). Nonetheless, at his deposition on October 11, 2022, Plaintiff replied "No" to the question, "Sitting here today, have you ever had any concerns with any treatment that Dr. Bosholm has given you?" (Docket Entry 117-6 at 1-2.)  He further testified that, as far as he knew, prior to February 2016, he suffered from no medication allergies.  (Id. at 3.)

Given his memory loss, Plaintiff relies on NCDPS business records for the "complete factual basis for his claims against [Dr.] Bosholm." (Docket Entry 120-27 at 1.)  However, within the last year or so, "when Plaintiff went to [m]edical at Greene Correctional Institution," he recalled "a conversation he had with a fellow inmate who was black." (Id. at 2.)  Specifically:

> Plaintiff remembers having significant chest pain such that he felt like he was choking, that he could not breathe, and that his lungs did not work.  While Plaintiff was lying in bed because he was too sick to get out of it, the black inmate asked Plaintiff if Plaintiff needed anything or wanted him to get a nurse.  The black inmate could observe that [Plaintiff] was very sick. Plaintiff responded that he thought the nurse would say he was faking his sickness.  Plaintiff told the black inmate that a nurse had told Plaintiff before that Plaintiff was faking it and Plaintiff thought she would say it again.  Plaintiff believes that the black inmate then told a correctional officer that Plaintiff needed medical attention.  Eventually, a nurse or other medical

15

provider arrived.  This nurse or other medical provider was a white woman with dark, curly, shoulder-length hair.  The black inmate pointed at Plaintiff when the nurse or other medical provider arrived and said, "That's him."  The nurse or other medical provider did not examine Plaintiff — she did not check Plaintiff's temperature, pulse, blood pressure, or breathing.  Instead, she just looked at Plaintiff and said "Oh no.  Again?  He [sic] faking."  Plaintiff has no additional memory of events before or after the foregoing events.  The foregoing events feel distant and "like a dream" to Plaintiff, but Plaintiff believes that this conversation occurred sometime between February 26 and February 29, 2016.

(Id. at 2-3.)

In addition,

[Plaintiff] had a conversation with another inmate who Plaintiff knows as "Hunt."  Plaintiff understands that Hunt is a Lumbee Indian from Lumberton in his sixties or seventies who has light skin, short dark hair, no facial hair, and is about 5'6".  Plaintiff saw Hunt in approximately 2018 when both he and Hunt were at Central Prison.  Plaintiff was not incarcerated at Central Prison at the time but had been transported there for a medical appointment.  While Hunt and Plaintiff were standing near each other preparing to be transported back to their respective prisons, the following conversation occurred, to the best of Plaintiff's current memory:

Hunt:   "It's you?"   Hunt seemed very surprised.  Plaintiff turned around to look at Hunt.  "Mr. Moreno, that's you?"

Plaintiff:   "Yeah."   Hunt then walked closer to Plaintiff.

Hunt:  "Let me see your hands.  Your nails aren't black; there's no more black."

Plaintiff:  "No, they've never been black."

Hunt:  "Yes, your nails were black, you had cables on your chest.  You don't remember?"

Plaintiff:  "No."

16

Hunt: "Everyone at Scotland though[t] you were dying."

Plaintiff: "No, I'm right here."

Hunt: "Your neck is not dark."

Plaintiff: "No."

Hunt: "When you were at Scotland, you got real sick, your nails were black, you had cables on your chest, your neck had a rash. The fellows tried to ask for help for you. They don't listen, they don't do nothing." Plaintiff understood "[t]he fellows" to mean his fellow inmates and "they" to mean the correctional officers. "A couple of days after, you were gone. A couple of weeks later, they said you died."

Plaintiff has not seen Hunt or anyone with whom he was incarcerated at Scotland Correctional Institution of which he was aware since this conversation occurred.

(Id. at 3-4 (final set of brackets in original).)

## IV. NCDPS Materials & Medical Records

Plaintiff, born and raised in Mexico (see Docket Entry 120-1 at 7), speaks Spanish and requires a translator to communicate in English (see Docket Entry 120-18 at 35 (indicating in February 2016 hospital records that "[Plaintiff] is Spanish-speaking that [sic] he understands much more than he can verbalize" and that "[p]rison guard served as translator"); see also, e.g., Docket Entry 120-1 at 3, 13, 18 (reflecting interpreter's involvement in Plaintiff's deposition)).

According to his NCDPS medical records, on February 26, 2016, Plaintiff presented as a "Self Declared Emergency" to Medical for "Cold or Flu Symptoms." (Docket Entry 120-6 at 12.) Nurse Sullivan served as the provider in this encounter, the record of

17

which bears the title "Clinical Encounter." (Id.)[5]  In this record, Sullivan identifies an onset and duration of "3-5 Days" for Plaintiff's symptoms, noting in the "Subjective" category that he came "to medical for cold symptoms that are ongoing for 5 days.  He has a sore throat and body aches.  Sinus pain, pressure and coughing up green sputum." (Id.)

Per the "Objective" component of Plaintiff's medical record, Sullivan obtained Plaintiff's temperature (98.8 degrees Fahrenheit), pulse (80 beats per minute), respiration (22 breaths per minute), and oxygen content (96%), but performed no (further) examination.  (Id.)[6]  Her "Assessment" indicates: "Impaired

_____

5  Per Dr. Arthur Campbell, III, an NCDPS Federal Rule of Civil Procedure 30(b)(6) corporate designee (see Docket Entry 120-3 at 1), clinical encounters "are inside [NC]DPS medical appointments" (id. at 49), the records of which constitute the only way to "prove" that an appointment occurred (id.).  The clinical notes in these records follow the "SOAP format[:]  subjective, objective, assessment, and plan," with (i) "the subjective" portion reflecting "the chief complaint and specific things that a patient tells [the provider] about their condition," (ii) the "[o]bjective" section detailing "the things that [the providers] measure or assess . . . or examine as part of that evaluation," (iii) "[t]he assessment" piece indicating "what [the providers] believe is going on based on [the] summary of [their] findings, and [what they] believe might be the cause of what's going on," and (iv) "the plan [outlining] what action [they] plan to take as a result of that." (Id. at 43-44.)

6  In his deposition, Campbell describes Plaintiff's condition on February 26, 2016, as "semi-urgent probably, maybe even routine, but certainly in the semi-urgent [rather than urgent] category." (Docket Entry 120-3 at 9.)  An urgent matter necessitates a medical provider's immediate involvement and a semi-urgent matter indicates that an inmate "need[s] to see the provider . . . sooner rather than later" (id.).  (See id. at 8-9.)  Notably, though, Campbell states that he based this classification on his belief that

18

comfort[. Plaintiff] to medical for cold and flu symptoms that are ongoing for 5 days. He states he is coughing up green/yellow sputum and he is stating that nothing makes him feel better or worse." (Id.) For the "Plan," Sullivan ordered certain over-the-counter medications for Plaintiff (see id. at 13) and selected "Refer to Provider" as the "Disposition." (Id.) She also indicated — as the "Patient Education Topics" — "Counseling" on "Compliance — Treatment," as to which Plaintiff "Verbalize[d] Understanding" (id.); however, the record does not mention use of an interpreter (see id. at 12-13).[7] The record, which Sullivan completed at 4:22 p.m. on February 26, 2016, indicates a "Request[]

_____

Plaintiff's "respiratory rate . . . was 20 which is normal," "[h]is oxygen saturation was . . . 98 percent," he remained "on room air," and "[h]is pulse was normal when you look at those things all told." (Id. at 11.) Campbell also asserts that, although Plaintiff "had some cough," he "was able to carry, you know — speak in full sentences, [so there was] no reason to believe his airway was compromised or he was having any shortness of breath." (Id. at 12.) Plaintiff's medical records, however, reflect a respiratory rate of 22, an oxygen saturation of 96, and no basis for assessing the extent of Plaintiff's communication abilities that day. (See Docket Entry 120-6 at 10-14; see also Docket Entry 120-18 at 7 (indicting as part of "sepsis screen" in Scotland Memorial Hospital medical records that Plaintiff qualified as "Positive for Respiratory rate >20bpm").)

    7  None of the medical records in this exhibit reflect involvement of an interpreter. (See id. at 1-16.) According to the then-applicable NCDPS Health Services Policy & Procedure Manual, though, "[i]nmates unable to understand English shall have access to health care procedures explained by a translator or translation service provided by the Department." (Docket Entry 120-15 at 1.) Under this policy, "[f]oreign language interpreters will be available 24 hours a day, 7 days a week" (id.) through a telephone call service (see id. at 1-3).

19

to be reviewed by Bosholm, Carol C MD" and that "Review documentation will be displayed on the following page." (Id. at 13.) The following page states only: "Reviewed with New Encounter Note by Bosholm, Carol C MD on 02/26/2016 17:07." (Id. at 14.)

Plaintiff's medical records also include a "Clinical Encounter — Administrative Note" by Dr. Bosholm. (See, e.g., id. at 11.) Plaintiff's medical records contain two identical copies of this document, both of which bear a large, bolded label stating "See Amendment" running diagonally across the page. (See id. at 10-11.)[8] The referenced amended document does not appear in the record. (See id. at 1-16.)[9] The reports appearing in the record document: "Review Note encounter performed at Non Patient Contact." (Id. at 10-11.)[10] Dr. Bosholm's "Administrative Note"

_____

8 According to Campbell, "[y]ou can't simply delete medical records." (Docket Entry 120-3 at 47.) If, "for whatever reason, you need to amend or update a record, you have to keep that initial record in there and do an amendment." (Id.) The only way to determine the amendment's contours is "to compare the notes to see if there is a difference in the notes." (Id. at 47-48.)

9 In Campbell's deposition, Plaintiff's lawyer stated that this exhibit contains all of Plaintiff's (SCI) "clinical encounter records from 2016." (Docket Entry 120-3 at 42-43; see also Docket Entry 120 at 2 (identifying exhibits).)

10 Notwithstanding that note, and apparently operating from memory (see Docket Entry 117-5 at 4 (Campbell stating (i) that "[he] would need to look at the records again to say exactly what was documented there," but (ii) that information would appear "in the clinical encounter notes," at which point lawyer states: "We'll look at those in a little bit"); Docket Entry 120-3 at 42-43 (marking as exhibit 2016 clinical encounter records and describing them as "the records [Campbell] w[as] referring to earlier about where [he] saw [Plaintiff's] symptoms that were being

20

relates "sore throat, cough, sinus congestion" and the records
provide as her "Assessment[:] Acute pharyngitis, J02 - Current[,
]Temporary/Acute, Not Assessed." (Id.)  The records reflect as a
"New Medication Order[]" a prescription for "Amoxicillin," ordered
at 5:07 p.m. on February 26, 2016, administered thrice daily for
seven days.  (Id.)[11]  The reports, which document "[c]omplet[ion]
by Bosholm, Carol C MD on 02/26/2016 17:09," lack a "Patient
Education Topics" category.  (Id.)[12]

---

assessed")), Campbell maintained in his deposition that Dr. Bosholm
examined Plaintiff on February 26, 2016 (see Docket Entry 117-5 at
3), and, as a consequence of that examination, diagnosed him with
pharyngitis, prompting his amoxicillin prescription (see Docket
Entry 120-3 at 15-16 (explaining that, "based on the exam by Dr.
Bosholm and his presentation, she felt that it was indicated he had
a significant enough pharyngitis to warrant antibiotics" and that
a doctor determines if a throat infection exists "based on the
exam.  Basically, you do an oral pharyngitis exam with a light,
have them open their mouth like we've all done at the doctor's
office.")).

    11 Per Campbell, NCDPS records did not document a (potential)
amoxicillin allergy for Plaintiff until approximately 2019. (See
Docket Entry 117-5 at 6-7.)

    12 Campbell maintains, however, that either Dr. Bosholm or
Sullivan gave Plaintiff "the specific instructions we always
provide . . . that if your condition worsens, if you get concerned,
if anything changes, you immediately seek follow-up."  (Docket
Entry 117-5 at 3.)  He asserts that "[i]t's documented in the
records, they provided that follow-up," noting that, "usually
around the disposition, they will tell them, you know, it could be
as simple as follow-up PRN.  There will be an annotation there that
they gave those instructions."  (Id. at 4.)  As for what notation
in Plaintiff's records Campbell saw "that assure[d him] that
happened," Campbell admitted, "I would need to look at the records
again to say exactly what was documented there," but that the
documentation would appear in the clinical encounter notes.  (Id.)
Although Sullivan's record indicates "[c]ounseling" on
"[c]ompliance - [t]reatment" (Docket Entry 120-6 at 13), Dr.

21

As the clinical records reflect (see id. at 10-13), per Dr. Arthur Campbell, III, an NCDPS corporate designee under Rule 30(b)(6) of the Federal Rules of Civil Procedure (at times, the "Rules") (see Docket Entry 120-3 at 1), nobody examined Plaintiff's lungs on February 26, 2016 (see id. at 44; see also id. at 13 (indicating that "different sorts of assessments [that] were done on [Plaintff]" appear "in his medical records"), 43-44 (identifying information generally contained in medical records), 49-50 (explaining that all vital signs taken at NCDPS "are supposed to be" recorded in clinical encounters, which constitute the only record of medical appointments inside NCDPS)). However, Campbell confirmed that whether a person's "lung exam is clear" remains a factor in assessing whether shortness of breath qualifies as an urgent or a semi-urgent matter. (Id. at 10-11.)

The next record documents a "Clinical Encounter," specifically an "Emergency encounter performed at Housing Unit" (Docket Entry 120-6 at 7), by nurse Josh Brinkley at 2:15 p.m. on February 29,

---

Bosholm's record does not mention any instructions to Plaintiff on February 26, 2016 (id. at 10-11). Notably, the vast majority of "Patient Education Assessments & Topics" provided to Plaintiff in 2016 involve "Access to Care," with the note "Encouraged to call with any concerns or problems" occasionally appearing alongside such notation. (See Docket Entry 120-8 at 1-10.) "Access to Care" and "Compliance - Treatment" appear to encompass different instructions, as medical providers at least once offered an "Access to Care" instruction alongside their "Compliance – Treatment" instruction. (See id. at 5.)

2016.  (Id. at 7-9.)[13]  It identifies the "Chief Complaint" as "Pulmonary/respiratory" with subjective symptoms of "headache, vomiting."  (Id. at 7.)  The Range of Symptoms identifies an abnormal Pulmonary/Respiratory System, indicating:  "afebrile offender presented, complain of vomiting and headache.  [Oxygen saturation] on room air 85%.  [N]o vomiting, cyanosis noted to [Plaintiff's] nailbeds and lips.  [Oxygen] applied via nasal cannula at 3 liters.  [Saturation] up to 92% with deep inhalation, diminished lung sounds, no wheezes noted, offender taken to main medical."  (Id.)[14]  The objective component of the report indicates that, at 2:14 p.m., Brinkley obtained Plaintiff's temperature (97.4 degrees Fahrenheit), pulse (103 beats per minute), respiration rate (20 breaths per minute), blood pressure (100/72), and oxygen saturation (85% on "Room Air").  (Id.)

The "Assessment" reflects "Impaired gas exchange" and for the "Plan," the "Disposition" states "Refer to Provider."  (Id. at 7-8.)  According to the record, Brinkley did not engage in any "Patient Education Topics."  (Id. at 8 (identifying "Format" as

_____

13  Per another NCDPS Rule 30(b)(6) corporate designee, Joshua Panter (see Docket Entry 120-4 at 1), Plaintiff was found unresponsive in his cell on the date he went to Scotland Memorial Hospital (see id. at 5-8).

14  According to Campbell, cyanosis "[i]s a bluish coloration, discoloration of the skin as a result of generally lack of oxygen." (Docket Entry 120-3 at 46.)  One can "[o]ften" tell if somebody suffers from cyanosis "just by looking at [them]," but NCDPS records do not reveal how long Plaintiff had "exhibited cyanosis" prior to this medical encounter.  (Id.)

23

"Not Done" and "Outcome" as "No Participation").)  The record was "Completed by Brinkley" at 2:23 p.m. and "Requested to be reviewed by Bosholm, Carol C MD."  (Id.; see also id. ("Review documentation will be displayed on the following page.").)  The following page merely states:  "Reviewed by Bosholm, Carol C MD on 03/02/2016 15:04."  (Id. at 9.)  Per Campbell, "[a]t no point prior to February 29th at 2:14 p.m. after the 26th was [Plaintiff's] pulse, respiration, blood pressure, or [oxygen] levels checked." (Docket Entry 120-3 at 47.)

The remainder of the exhibit with Plaintiff's medical records contains two identical copies of a report completed at 2:32 p.m. by Dr. Bosholm and amended by her at 2:33 p.m., as well as the amended version thereof.  (See Docket Entry 120-6 at 1-6.)  The original reports describe a "Provider Evaluation encounter performed at Clinic" at 2:18 p.m. on February 29, 2016, with Dr. Bosholm as the provider.  (Id. at 2, 4.)[15]  All three reports identify "Infectious Disease" as Plaintiff's "Chief Complaint."  (Id. at 1-2, 4.)  The subjective component of each report states:

> He was noted to look hypoxic with blue around his lips. Pulse ox[ygen] was 80% on room air.  He was put on[ ]3 l[iters] [oxygen] via [nasal cannula] and O2 sat[uration] increased to 91%.  He was not wheezing and did not have a fever.

---

15    The amended version changes the encounter time to 2:33 p.m., but otherwise reflects the same information regarding the nature of the encounter, its location, and the provider.  (Id. at 1.)

24

He had been [complaining of] vomiting and headache. He was prescribed Amoxicillin, but had not yet started on it[.]

(Id. at 1, 2, 4.)[16]

These reports reflect an onset and duration of "3-5 Days" and bear the same "Objective" "Exam" and "Assessment" information, namely that listening to Plaintiff's lungs reveals "Crackles" but no "Wheezing," with "crackles at bases of lungs, B/L [sic]," as well as "Air movement heard in upper lungs," prompting an assessment of "Respiratory failure, unsp, unsp w hypoxia or hypercapnia, J96.90 - Current, Temporary/Actue, Initial." (Id. at 1, 2, 4.) The amended report provides no information under the "Plan" section and includes no "Disposition," "Patient Education Topics," or "Other" sections. (Id. at 1.)

Conversely, the original reports indicate as the "Plan" a "New Consultation Request[]" consisting of a "UR Request" with an "Emergent" Priority and "No" Translator, with "Hypoxia" as the "Reason for Request" and a "Provisional Diagnosis" of "Likely pneumonia — possible aspiration. Was vomiting." (Id. at 2, 4.) The "Disposition" relates "Transfer to Local Hospital" and an "Other" section states: "Given a nebulizer treatment." (Id. at 2, 4.) The "Patient Education Topics" list a "Counseling" format

_____

16 Per Campbell, "[h]ypoxia is a lack of oxygenation," i.e., "when your O2 levels are low" (Docket Entry 120-3 at 48) and, based on Plaintiff's records, "[t]he blue or cyanosis around his lips leads [one] to believe [he wa]s hypoxic" (id. at 49).

25

regarding "Access to Care" by Dr. Bosholm, in regards to which Plaintiff "Verbalizes Understanding." (Id. at 3, 5.)

Under the Communicable Disease provisions of the then-applicable NCDPS Health Services Policy & Procedure Manual, "[t]o protect the inmate population from communicable diseases, all inmates reasonably suspected of having a communicable disease which requires isolation, will be isolated immediately in one of the Division's health care facility isolation rooms." (Docket Entry 120-16 at 3.) According to Campbell, "the medical authority at the facility [determines] what the parameters for th[e] quarantine are," including regarding "what sorts of monitoring and services should be provided [quarantined] offenders." (Docket Entry 120-3 at 59.) In situations involving "a group like this," rather than written documentation, "verbal guidance from the provider, whoever the health authority is," conveys the parameters to "custody . . . because that's really who has to ensure that occurs." (Id. at 59-60.)

Notably, though, "correctional staff are not trained to know when an offender is sick." (Docket Entry 120-4 at 19; see id. at 4 (explaining that correctional officers "are trained to respond in emergency situations" whereas "[h]ealth-care staff are the ones who are trained to be able to evaluate, treat, and potentially characterize an inmate as being sick or more sick or less sick"); see also id. at 18 (explaining that, "if correctional staff

26

encountered an offender who was in an emergent state, they would be responsible or it would be expected of them to notify staff that this offender needed some type of assistance").) Instead, health-care staff bear "responsibility to check on offenders who are . . . in need of checking on." (Id. at 18.) Correctional officers engaged in routine rounds "are not looking for medical conditions, or they are not reviewing the medical condition of an offender outside of those emergent circumstances" (id. at 20), in which circumstances "they would be responsible or it would be expected of them to notify staff that this offender needed some type of assistance" (id. at 18). This remains true even in periods where, like here, medical staff did not make rounds of the quarantined inmates for a twenty-four-hour period. (See id. at 15-20.)

As for any NCDPS policies or procedures regarding "how [Plaintiff] was treated during the quarantine period" (id. at 21), NCDPS Rule 30(b)(6) corporate designee Joshua Panter (see id. at 1) stated:

> So to my knowledge at the time, there was no policy on quarantines. The custody staff would have been given directives by health-care staff, for example, to quarantine a group of inmates and any other type of directors [sic] or medical orders that would be necessary that needed to be communicated to them.
>
> So, for example, if the offenders couldn't come into contact with each other and they needed to be secluded to a cell, that could potentially be an order that was communicated to [sic] health-care staff to custody staff to ensure that's carried out.

27

(Id. at 21-22.)  As for how such orders "get communicated," Panter explained:  "It can be in writing.  It can be in a verbal communication, directives given to a staff member.  It can be by e-mail."  (Id. at 22.)  "To [his] knowledge," however, medical providers did not give correctional officers assigned to the unit with the quarantined inmates "any special instructions" regarding "when or if to notify medical about any issues" (id. at 9; see also id. at 10).

For his part, Campbell insisted that officers were told "there is flu, an upper respiratory infection, and they need to minimize interaction between offenders outside of that cohort, and they need to take precautions themselves."  (Docket Entry 120-3 at 34.)  He maintained that officers received information regarding worsening symptoms to monitor (see id.); specifically, they should watch for "the symptoms you expect to see with upper respiratory infection" (id. at 35; see also id. ("[Campbell] think[s] there were some e-mails kind of laying out some of those symptoms.")).  He elaborated:  "So the things we talked about — cough, congestion, myalgias, fever — you know, they were kind of told that that's what they should be looking out for within that area."  (Id.)  As for any response if they noticed such circumstances, Campbell stated: "obviously, talk to the offender and notify medical if the offender's concerned."  (Id.)

28

At 5:56 p.m. on Friday, February 26, 2016, the NCDPS Infection Control Coordinator, Pamela Gibbs, sent an email entitled "Influenza" to various individuals at, inter alia, SCI. (Docket Entry 121-5 at 4-5.) Largely focused on "measures to reduce transmission among patients and staff" (id. at 4; see id. at 4-5), this email offers various "recommendations" designed "[t]o assist [the] facility in its assessment and followup of patients and staff with possible influenza," including noting symptoms that individuals may experience. (Id. at 4.)[17] Among the recommendations, the email encourages SCI personnel to consider "[h]av[ing] symptomatic residents stay in their own rooms as much as possible, including restricting them from common activities, and have their meals served in their rooms when possible." (Id.) It further notes that "[i]nfluenza antiviral prescription drugs can be used to treat influenza or to prevent influenza and are available as indicated by the provider." (Id. at 5.)

_____

17 Campbell said this email provided correctional officers with information regarding "what [symptoms] they need to be looking out for" in order to alert Medical (Docket Entry 120-3 at 56-57) during the quarantine. (See id. at 34-35; 56-57.) He further conceded that no other document "shows the correctional officers what symptoms to be aware of in order to alert medical of an emergency." (Id. at 57.) Notably, though, nothing in the email itself reflects its transmission to correctional officers (see Docket Entry 121-5 at 4-5), and Panter maintained that correctional officers received no "special instructions" on when to notify Medical regarding issues during the quarantine (Docket Entry 120-4 at 9; see id. at 9-10).

At 6:56 p.m., SCI nurse Ella Dixie responded to that email, copying, among others, Dr. Bosholm, as follows:

> I have talked with Dr. Bosholm and she has advised that she was concerned and wrote orders for five offenders to be quarantined. Seven of the symptomatic offend[ers] were seen by our provider before she departed for the day.
>
> The Administrative Team have provided us with an area/Tear [sic] of our facility to house our sick offenders.
>
> They have brought them to us in a very timely manner and have provided us with enough support to get the assessments completed. An officer has been assigned to pick up Tamiflu from the C.P. pharmacy. We are awaiting their return call.
>
> The offenders will have access to fluids and will be monitored. No one will be released from this area until they are without a fever for 24 hours.
>
> Influenza vaccines are being administered as recommended.
>
> Staff will be monitored for sings [sic] and symptoms and there will be a reduction in movement of staff in all areas. This should reduce the spread of infections in our facility. . . .

(Id. at 3.)

Approximately an hour later, Dixie sent another email, again copying Dr. Bosholm, stating:

> I have talked with the On-Call Pharmacist, Nancy Mentzer[.] She has advised that she will have to talk to her Supervisor. Our Provider has ordered Tamiflu for four of our offenders. We will need more for the weekend. It will take an hour for her to get to the facility and another hour and a half to fill the Rxs. She will call the facility when she arrives at the Apex pharmacy and we will advise our OIC/Superintendent when to dispatch an officer to pick up the medication.

30

> All affected offenders will be monitored every shift and everyone will be seen for flu symptoms as needed.
>
> Please [n]ote that the [sic] Mrs. Ramsey will be in the facility all day Saturday.  I can be reached by phone if needed.

(Id. at 2.)

At 2:10 p.m. on Saturday, February 27, 2016, Victoria Ramsey, a nurse practitioner, sent an update email, to the same recipients, which states:

> Inmates still Quarantined in one section of their unit.  Vital signs assessments completed by nursing, no temps >100.  I conducted a walk-thru round and spoke to all the inmates (19), only one complained of a mild headache, the rest were fine with no complaints verbalized.  Tamiflu was administered to 4 of the inmates.  Visitation was cancelled for 2 inmates.  Plan is to keep inmates in quarantine until assessed by Dr[.] Bosholm on Monday.  Report given to Ms. Gibbs by phone.

(Id.)[18]  This email constitutes the only "recording of what the nurse practitioner did."  (Docket Entry 120-3 at 56.)[19]  Finally,

---

18  Notably, although she avers that she did not "work[] on February 27 or February 28, 2016" (Docket Entry 117-1 at 1; see Docket Entry 123-1 at 1-2 (apparently verifying relevant assertion)), the record does not reveal the involvement of any SCI doctor other than Dr. Bosholm with the quarantine or these emails.  (See, e.g., Docket Entry 121-5 at 2-5.)

19  According to Campbell, Ramsey's actions on February 27 constitute the only reassessment by a "provider," as distinct from "nursing," that Plaintiff and the other inmates received during the quarantine.  (See id. at 24.)  In this regard, Campbell testified:

> So on the 26th, all of these 19 offenders were initially assessed and treated based on their presentations.  They were placed on quarantine.
>
> From what we can tell from the records, they were reassessed by a provider the following day, on the 27th.

31

an email entitled "events of the day," sent at 5:05 p.m. on Monday,
February 29, 2016, states in relevant part that "inmates in D-pod
came off the quarantine at 1005 hours per medical." (Docket Entry
121-5 at 1.)[20]

Although Dixie's original email indicates that "[n]o one will
be released from [quarantine] until they are without a fever for 24
hours" (Docket Entry 121-5 at 3), it appears that Brinkley did not
obtain Plaintiff's temperature until 10:47 a.m. on February 29,

---

They received reassessments by nursing on the 27th,
particularly temperature and, again, a provider when they
went through specifically asked about symptoms.

They were — again, had reassessments by nursing on
the 28th, including a temperature, and then, again, on
the 29th, they were all reassessed, again with a
temperature, and it was on that date that [Plaintiff]
presented with worsening symptoms.

(Id.) As for what nursing reassessments entailed, Campbell
explained: "that's nursing rounds. So they go through the unit,
get a temperature, and ask those individuals are they having
concerns or symptoms or anything, any change in their condition."
(Id.) The process of taking a patient's temperature lasts one
minute or less and, when asked how long a nurse doing rounds stays
with any individual, Campbell said, "long enough to do that, you
know, move from place to place." (Id. at 40.) Notably, the only
reporting from these nursing rounds "are temperature logs that
. . . they took for each individual" (id. at 25), but Campbell
maintains that, "obviously, it's routine to ask them how are you
feeling, has anything changed, take their temperature" (id. at 41;
see also id. ("So that conversation happens with each individual as
they go around.")). No other efforts to monitor Plaintiff's
symptoms occurred while he remained quarantined. (Id. at 27.)

20  This email does not appear to involve any medical
personnel. (See id. (lacking any indicators that recipients worked
in medical capacity and stating in full: "Had a good day,
maintenance on unit working on the lockers and inmates in D-pod
came off the quarantine at 1005 hours per medical.").)

32

2016 (see Docket Entry 120-9 at 1, 9), after Medical lifted the quarantine (see, e.g., Docket Entry 121-4 at 4, 57 (indicating that Medical lifted quarantine by 10:17 a.m.)). At that point, it registered at 99.3 degrees Fahrenheit. (See Docket Entry 120-9 at 9.)[21] Brinkley also obtained temperature readings from Plaintiff over the weekend, with a temperature of 97.7 degrees Fahrenheit at 9:10 a.m. on February 27, 2016, and 97.9 degrees Fahrenheit at 9:37 a.m. on February 28, 2016. (Id.) As noted, Sullivan had obtained a temperature reading of 98.8 degrees Fahrenheit at 4:12 p.m. on February 26, 2016. (Id.)

Yet, as Campbell acknowledged, nothing about one's temperature indicates one's oxygen levels. (Docket Entry 120-3 at 42.) And, in addition to forgoing examination of Plaintiff's lungs on February 26, 2016 (see id. at 44), no medical personnel checked Plaintiff's lungs or oxygen levels on February 27, 2016, or February 28, 2016 (see id. at 26-27). Indeed, "[a]t no point prior to February 29th at 2:14 p.m. after [February] 26th was [Plaintiff's] pulse, respiration, blood pressure, or [oxygen] levels checked." (Id. at 47.) Further, nobody at Scotland tested Plaintiff for the flu prior to his hospitalization (see id. at 30) or provided him with Tamiflu (see id. at 30-31), although at least four inmates underwent such testing and started on Tamiflu on

---

21 When Brinkley obtained Plaintiff's temperature at 2:14 that afternoon, it registered at 97.4 degrees Fahrenheit. (Id. at 8-9.)

33

February 26 (see id. at 30). (See also Docket Entry 120-18 at 35 (stating in Scotland Memorial Hospital records: "[Plaintiff] reports that he was treated for influenza last week however his medicine records shows that he was started on amoxicillin last week 3 times a day. No Tamiflu noted.").) Finally, to treat an individual whose oxygen saturation drops below 92, "[o]xygen is the first thing obviously, so place them on supplemental oxygen," which treatment SCI could provide in 2016. (Docket Entry 120-3 at 58.)[22]

## V. Plaintiff's Expert Witness

Plaintiff's expert witness, Dr. Robert Hodges Bilbro, provided a sworn expert report (see Docket Entry 120-28 at 1-7), as well as deposition testimony (see Docket Entries 117-4, 120-2). In relevant part, the expert report states:

> My opinions, as set out in this report, are based on my knowledge, training and experience, and the application of that knowledge, training and experience to the factual information I have received.

> [Plaintiff] was seen on February 26, 2016 at the Scotland Correctional Institution by Heather Sullivan, RN lead nurse at the prison, and Carol Bosholm, M.D., a physician for the prison. [Plaintiff] had respiratory symptoms including cough and discolored sputum, and it was noted in his medical records that he had cold and flu symptoms. He was prescribed amoxicillin, 500 milligrams three times a day. A medication administration record

---

22 According to the NCDPS Health Services Policy & Procedure Manual, as of at least June 2014, "[a]ll prison facilities will have a small, portable oxygen cylinder for emergency purposes," and certain prisons will have additional oxygen sources, such as oxygen concentrators, "large, secured oxygen cylinders[,] and/or wall oxygen." (Docket Entry 120-17 at 1.)

34

from the Scotland Correctional Institution indicates that he received at least one dose on February 26, 2016.

[Plaintiff] was then placed in isolation, along with several other inmates who also had flu symptoms, from February 26, 2016 to February 29, 2016.

It is my opinion that [Plaintiff] did not receive adequate medical care between February 26, 2016 and February 29, 2016, while he was at the Scotland Correctional Institution. It is my further opinion that such inadequate medical care for [Plaintiff] made his illness much more severe and life-threatening. During those days, records indicate that his oxygen saturation was measured as normal on February 26, 2016, but no such further measurements were made again until February 29, 2016, when [Plaintiff's] medical condition had worsened and his blood oxygen level had dropped significantly. There is no record of vital signs being taken or clinical observations made during the period that he was in isolation, other than occasional temperature measurements. Had routine clinical observations or blood oxygen levels been measured, his deteriorating condition would have been apparent.

In addition, he was given no Tamiflu or other antiviral agents to try to limit the intensity of his illness even though he had been experiencing symptoms of flu.

On February 29, 2016, [Plaintiff's] distress was finally noted. At that point his blood oxygen level was measured at 80% which is alarmingly low (less than 92% being abnormal). He was transferred to the local Scotland Memorial Hospital. He was admitted to the hospital with the diagnoses of respiratory failure, kidney failure, and he had an abnormally high blood sugar indicating diabetes. At the time of admission he was conscious and communicative. Wheezing was notable in both lungs. Initial laboratory tests included low oxygen saturation at 80%, abnormal kidney function tests with creatinine 4.6, blood glucose of 484 with A-1C 7.2, and a chest x-ray showing congestion, but no localized infiltrate. His initial tests for influenza A and B were both negative. Within a few hours he markedly deteriorated and had a generalized seizure causing a loss of consciousness after which he was non-communicative and had a distressing decline in blood pressure. He was then

35

intubated with ventilator support. On March 2, 2016, he was transferred to Carolinas Medical Center for further treatment.

After transfer to Carolinas Medical Center, [Plaintiff's] test for influenza A (H1N1, commonly known as "swine flu") was positive. His respiratory failure persisted as severe, requiring tracheostomy (placing a tube through an incision in his neck into his windpipe) followed by several months of support with a ventilator. His chest x-ray showed changes consistent with viral pneumonia plus plural effusions (fluid in the chest around the lungs).

[Plaintiff] also had severe kidney failure that required repeated dialysis. The imaging of his brain by both CT scans and MRI was initially normal, but when repeated a month later, the imaging showed widespread changes of encephalopathy (brain damage) and petechial hemorrhages (scattered small sites of bleeding). My assessment of [Plaintiff's] situation at that point, was that his chances of surviving were low. That very poor prognosis was based on the damage to his brain causing seizures and prolonged coma, his kidneys not functioning adequately, and his needing mechanical support for breathing.

On April 8, 2016, [Plaintiff] was transferred to Kindred Hospital in Greensboro. Even after two months of intensive medical management and in his third hospital, he remained totally dependent on the ventilator, needed repeated dialysis, and was poorly communicative. He continued on daily insulin since his initial hospitalization on February 29. His prognosis in May 2016 remained poor.

Nearly eight months after the onset of his illness, [Plaintiff's] medical condition began to improve, in spite of his earlier poor prognosis, with his no longer being dependent on the ventilator, having improved kidney function, and communicating better. Nevertheless, he had experienced severe weight loss, was eating poorly, and was getting food supplements. His prognosis had improved with expected survival, but with ongoing pain and impairment. He was unable to walk, had some mental impairment, was chronically depressed, and having frequent distressing nightmares. [Plaintiff] continues to have these issues to date.

36

It is my opinion that if [Plaintiff's] deterioration and respiratory distress had been recognized sooner, either on February 27, 2016 or February 28, 2016, he could have been treated with supportive measures including oxygen supplement and monitoring of his blood oxygen level. If his oxygen level remained low, he could have been transferred sooner for a ventilator to be used. That likely would have prevented the injury to his brain with seizures and the months-long coma.

It is notable that [Plaintiff's] health, before the 2016 incident, had been good. He had been incarcerated for four years up to that point. Medical notes indicated that he had relatively mild psoriasis and intermittent esophageal reflux which was bothersome but not disabling or life-threatening. Routine lab tests in 2014 had been normal including kidney function tests and blood glucose.

(Docket Entry 120-28 at 4-6.)

As relevant to the Motion, Dr. Bilbro also testified:

After thirty-five years of practicing Internal Medicine (Docket Entry 117-4 at 3), he retired from his Internal Medicine practice approximately fifteen years ago (Docket Entry 120-2 at 4-5). From 1999 through his deposition in December 2022, he volunteered with Healing Transitions, a residential recovery facility for homeless individuals experiencing addiction. (Id. at 5.) For approximately ten years, from around 2008 to 2018, he volunteered with Alliance Medical Ministry, a clinic serving uninsured individuals, where he provided internal medicine services to patients. (Id. at 5-7.) For approximately eight years during this period, he also worked with Community Care of North Carolina (id. at 5), an organization that supports "physicians in practices that take care of Medicaid patients," in connection with which he

37

"did not see patients . . . but advised and supported practices who were working to take care of Medicaid patients" (Docket Entry 117-4 at 2). From February 2015 to February 2016, he spent approximately 70 percent of his working time with Community Care, 25 percent with Alliance Medical Ministry, and 5 percent with Healing Transitions. (Id. at 2-4.) In all three roles he supervised other medical personnel. (Docket Entry 120-2 at 11-12.)

In terms of this action, Dr. Bilbro's "concern was the deficiency of [Plaintiff's] care between February 26 and 29, 2016. He did not get the care he needed then. And which provider was involved, [Dr. Bilbro] didn't focus on that." (Id. at 13 (explaining that he "was concerned with the things that were not done in the care of [Plaintiff]" and "did not focus on which provider was involved").) Because Dr. Bilbro "didn't piece apart which provider [he] think[s] should have done this or which provider [he] think[s] should have done that," he "would have to dig into records to [provide a list of who violated the standard of care]." (Id.) Accordingly, in response to the question, "If I were to ask you, for example, . . . if you believe to a reasonable degree of medical certainty that Dr. Carol Bosholm violated the standard of care, you wouldn't be able to tell me one way or the other?," Dr. Bilbro responded: "Well, I have – to my perception, she referred the patient on the 26th of February that year and then saw him again on the 29th. Did she have some responsibility for

38

the care that he received between the 26th and 29th? I'm not sure. But somebody did." (Id. at 13-14.) In response to the follow-up question of, "But you don't know whether that was her or not?," Dr. Bilbro stated: "Well, she was the doc in charge. She wasn't there as I understand it. But I'm not sure who, who failed to give him the care that he needed during that time." (Id. at 14.)

Setting aside the fact that he was "not sure what instructions she left in her absence," Dr. Bilbro offered no criticisms of the actual treatment Dr. Bosholm administered on February 26, 2016, and her decision to quarantine Plaintiff. (Id. at 14-15.) However, he harbored multiple concerns with the quarantine itself, including specifically the events of the weekend. (See, e.g., id. at 15-20.) In particular, Dr. Bilbro faulted the person in charge of the quarantine, explaining that "there should have been some orders, some directives. If the doctor wasn't there, did the doctor not leave some directives as to what they should do to observe these people, these 19 guys in quarantine?" (Id. at 16.) Dr. Bilbro further testified:

> [Plaintiff] should have had his oxygen saturation measured sometime during those three days — which would have triggered administering oxygen, and then following up carefully on his oxygen saturation, and perhaps moving sooner to ventilate to avoid the multiple organ damage that occurred as a result of hypoxemia or low oxygen level.

(Id.) Dr. Bilbro also criticized the failure to assess any vital signs other than Plaintiff's temperature, such as respirations,

39

pulse rate, and blood pressure. (See id. at 17.)[23] As for the care administered over the weekend, Dr. Bilbro noted that, according to the records, it consisted solely of the taking of the temperatures and the activities described in Ramsey's email, which "summarized the care that she was a part of rendering to those 19 guys over three days" (id. at 18). (See id. at 17-18.)

In Dr. Bilbro's view, Plaintiff's oxygen saturation "declined progressively during those three days" (id. at 19),[24] a situation that usually manifests itself with the patient feeling unwell and experiencing shortness of breath, an increased pulse rate, and somewhat labored and perhaps more rapid respiration (see id. at 21). (See id. at 18-21.) Dr. Bilbro further concluded that Plaintiff "had pneumonia," causing the decrease in his oxygen saturation. (Id. at 22.)

According to Dr. Bilbro, the quarantined inmates "should have had the pulse ox[imeter] done" to measure their oxygen saturation

_____

23 Dr. Bilbro further opined that "there should have been someone observing that [Plaintiff] wasn't doing well." (Id. at 16.) It remains unclear whether this opinion addresses matters distinct from the failure to make specific diagnostic assessments identified in Dr. Bilbro's expert report. (See Docket Entry 120-28 at 5.) In any event, the record (as detailed above) contains evidence of at least some medical personnel visiting the quarantined inmates on February 27 and 28, 2016. Regardless, the evidence as to those visits does not dispel the deficiencies in diagnostic assessments that Dr. Bilbro identified.

24 Dr. Bilbro explained that, in his experience, a patient's oxygen level would only drop from a normal oxygen saturation level on the morning of February 29 to 80% in the afternoon of February 29 if "there's some trauma involved." (Id. at 20.)

40

levels over the weekend. (Id. at 34.) He explained that individuals suffering from — or suspected of suffering from — influenza or pneumonia should "have their vitals, their pulse ox checked every day." (Id. at 34-35.)

Dr. Bilbro clarified that assessing Plaintiff's oxygen saturation over the weekend "would have guided treatment" but did not itself qualify as treatment, explaining:

> To have checked his vital signs more thoroughly than the temperature might have triggered measuring his oxygen saturation — which is simply done by attaching a pulse oximeter to the finger.
>
> If that had been done and seen that his oxygen level was low, then that's a diagnostic step that would have led to proper treatment of his hypoxemia.

(Id. at 23.) Dr. Bilbro elaborated:

> But those diagnostic assessments[, namely monitoring his oxygen saturation and measuring those vitals,] in my opinion would have led to giving him some oxygen by nasal cannula and then following up with more careful monitoring of his oxygen saturation. And if it was still low, he might have been referred for a ventilator.
>
> It's my understanding they wouldn't have done the ventilator there at the correctional institute, but they might have sent him to the hospital a day or so earlier to prevent the severe hypoxemia which caused multiple organ damage.

(Id. at 25; see also id. at 25-26 ("I'm assuming that they could have given him some oxygen by a nasal cannula. And then they would have measured his oxygen saturation probably every four to six hours. And if it was still low, they would have said aha, he needs

41

a ventilator.  And they would have had to have transferred him to

accomplish that I think.").)

     Dr. Bilbro and defense counsel then engaged in the following

exchange:

     [Defense Counsel:]  Okay.  And you can't identify any
     specific providers who you believe should have been
     taking these steps or who might have been responsible for
     these steps?

     [Dr. Bilbro:]  No.  And I think part of my grievance with
     what happened to him is not specific to the providers,
     but to the system.

     [Defense Counsel:]  Who — what do you mean?  Who are you,
     what entity are you referring to as the system?

     [Dr. Bilbro:]  The correctional, Scotland Correctional
     Institute.

     [Defense Counsel:]  Do you believe that the system failed
     [Plaintiff]?

     [Dr. Bilbro:]  Yes.

     [Defense Counsel:]  And tell me how.

     [Dr. Bilbro:]  Well, they allowed his oxygen level to get
     so low that it caused brain damage, prolonged coma,
     seizures, liver dysfunction, kidney failure, brought on
     his diabetes, left him with difficulty with his
     extremities, contracture in his legs, inability to walk,
     ongoing mental compromise, ongoing depression — all of
     which were as a result of extreme hypoxemia, low oxygen
     level.

     [Defense Counsel:]  So it's your opinion that these
     medical conditions stem or were caused by his,
     [Plaintiff's] oxygen level becoming low over those two
     days?

     [Dr. Bilbro:]  Yes — after three days.

     [Defense Counsel:]  Okay.  Meaning the 27th, 28th —

42

[Dr. Bilbro:]  27, 28, 29.

[Defense Counsel:]  Okay.  When you talk about the system failing him, do you believe that the system failed him because they didn't have appropriate protocols or policies in place to render the appropriate treatment or to guide the practitioners in what they needed to do?

[Dr. Bilbro:]  I think that's accurate.

[Defense Counsel:]  And by system, again, we're referring to Scotland Correctional Institution?

[Dr. Bilbro:]  Correct.

[Defense Counsel:]  What sorts of policies and procedures do you believe Scotland Correctional Institution should have had in place that would have changed [Plaintiff's] outcome here?

[Dr. Bilbro:]  Well, I think these 19 guys that were placed in quarantine because of flu-like illness should have had their vital signs checked with observation and measurement of their pulse rate, assessment of their respirations, blood pressure checks.

    And I think that might have led to somebody using a pulse oximeter to measure the oxygen level — especially in a patient who had pneumonia or even suspected pneumonia.

    Any respiratory symptoms might have led by a protocol to say let's do a pulse ox on him.

    And if one had been low, then he needed follow up.

[Defense Counsel:]  Okay.  So just to be sure I understand — your concern is that there wasn't some sort of policy or protocol that required these things to be, to be checked or to be monitored, and that your grievance is not so much with any individual provider?

[Dr. Bilbro:]  Correct.

[Defense Counsel:]  Are there any other protocols, I guess I should say policies and procedures that you believe should have been in place that would have averted [Plaintiff's] outcome?

43

[Dr. Bilbro:]  Not that I can think of.  Although, there would have been some policies and procedures that would have followed had his oxygen level been monitored.  If they couldn't get it up, so then they should have done X, Y, and Z.

[Defense Counsel:]  Are you able to say what those policies and procedures would have been or should have been?

[Dr. Bilbro:]  Well, I'm assuming they couldn't have used the ventilator at the correctional facility.  But they could have given, I think given him oxygen supplement and then monitored his oxygen saturation level.

        And if it had come up, fine.

        If it did not, they should have called an ambulance and moved the patient to where he could get a ventilator.

[Defense Counsel:]  Anything else that you think of in terms of policies and procedures?

[Dr. Bilbro:]  Not that I can think of.

[Defense Counsel:]  And is it your opinion to a reasonable degree of medical certainty that [Plaintiff], [Plaintiff's] oxygen saturation dropped due to the developing pneumonia and flu that he had?

[Dr. Bilbro:]  Yes.

[Defense Counsel:]  And that due to the oxygen saturation dropping, he ultimately became hypoxic and suffered the multi-organ damage that we've talked about?

[Dr. Bilbro:]  Yes.

[Defense Counsel:]  Are you able to say to a reasonable degree of medical certainty that, for example, if [Plaintiff's] oxygen saturation had been measured, say, on Saturday afternoon and it was 90 percent, that intervention at that point could have averted what happened here?

[Dr. Bilbro:]  Yes.

44

[Defense Counsel:]  And tell me more about that.  Why, how can you say that?

[Dr. Bilbro:]  Well, if it's, to follow your example, if it had been measured at 90 percent, that would have triggered let's give this guy some oxygen, then check his oxygen saturation frequently —

[Defense Counsel:]  Uh-huh.

[Dr. Bilbro:]  — for the rest of the day and through the night.

And if his oxygen level did not come up, then they would have said let's — first, they would have turned up the flow rate on the oxygen with his cannula.

And if it still didn't come up, they would have transferred him, should have transferred him.

And I think some steps should have been taken to keep the severe hypoxemia from occurring.  And that severe hypoxemia caused, as I say, multiple organ damage, almost killed the fellow.

I mean there for a while, I thought he was going to die.  And he did survive but with permanent disabilities — all of which could have been prevented by keeping the oxygen from going so low.

(Id. at 26-30.)

Finally, Dr. Bilbro testified that he did not know anything about Dr. Bosholm and had not reviewed any information regarding her training or background.  (Id. at 10.)

## VI.  Scotland Memorial Hospital Records

Plaintiff's medical records from Scotland Memorial Hospital indicate some confusion regarding the existence of an amoxicillin allergy (see, e.g., Docket Entry 120-18 at 9 ("Known Allergies[:] Amoxicillin (Unconfirmed): Reaction: rash")) and whether Plaintiff

45

took amoxicillin at SCI (<u>see, e.g.</u>, <u>id.</u> at 28 ("amoxicillin[:] Patient had been taking:  500 mg 3 times a day"), 32 ("In terms of the respiratory symptoms, it was first felt the patient may have had the flu and/or bronchitis.  The patient was __[sic] amoxicillin, not sure if that was started or not.  No Tamiflu.")).  Upon his arrival at Scotland Memorial Hospital, the medical providers prescribed and administered, among other medications, Tamiflu to Plaintiff.  (<u>See</u> <u>id.</u> at 26.)  On March 1, 2016, Scotland Memorial Hospital discharged Plaintiff to CMC, with a diagnosis of "[s]eptic shock with multiorgan failure, Acute respiratory failure, atypical pneumonia, ARDS."  (<u>Id.</u> at 34.)

**<u>DISCUSSION</u>**

**<u>I. Relevant Standards</u>**

**<u>A. Summary Judgment Standards</u>**

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The movant bears the burden of establishing absence of such dispute.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

46

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that

47

"[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).[25]

## B. Deliberate Indifference Standards

"[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his . . . medical care[,] . . . it transgresses the substantive limits on state action set by the Eighth Amendment . . . ." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989). Thus, "deliberate indifference to serious medical needs of prisoners" violates "the Eighth Amendment," Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also id. at 104-05 ("This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally

---

25 Thus, Defendant cannot rely on either her unsworn proffered expert report or her supplemental discovery answers, which post-date her verification, in support of her Motion. (See generally Docket Entries 117-1, 117-3, 123-1.)

48

interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." (footnotes omitted)).

Under that standard, Plaintiff must show that Defendant "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008) (citing <u>Estelle</u>, 429 U.S. at 104). A medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Id.</u> (internal quotation marks omitted). A defendant displays deliberate indifference where she possesses knowledge of the risk of harm to an inmate and knows that "h[er] actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." <u>Id.</u> (emphasis and internal quotation marks omitted); <u>see also</u> <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994))).

"[D]eliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge

49

that harm will result." <u>Farmer</u>, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." <u>De'lonta v. Johnson</u>, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted). A plaintiff can satisfy this standard by showing "'that a [defendant] knew of a substantial risk from the very fact that the risk was obvious.'" <u>Scinto</u>, 841 F.3d at 226 (quoting <u>Makdessi v. Fields</u>, 789 F.3d 126, 133 (4th Cir. 2015)).

A plaintiff can also establish "a prima facie case of deliberate indifference" where "'a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it.'" <u>Id.</u> (brackets and ellipsis in original) (quoting <u>Parrish ex rel. Lee v. Cleveland</u>, 372 F.3d 294, 303 (4th Cir. 2004)). In addition, "'[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs.'" <u>Id.</u> (brackets in original) (quoting <u>Miltier v. Beorn</u>, 896 F.2d 848, 853 (4th Cir. 1990), <u>overruled in part on other grounds by</u> <u>Farmer</u>, 511 U.S. at 837).

## C. Negligence

As for negligence claims in North Carolina, "under established common[-]law negligence principles, a plaintiff must offer evidence

50

of four essential elements in order to prevail: duty, breach of duty, proximate cause, and damages." Estate of Mullis by Dixon v. Monroe Oil Co., 349 N.C. 196, 201, 505 S.E.2d 131, 135 (1998). "Gross negligence is wanton conduct done with conscious or reckless disregard for the rights and safety of others." Bullins v. Schmidt, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1988), abrogated in part on other grounds by Young v. Woodall, 343 N.C. 459, 462, 471 S.E.2d 357, 359 (1996). Notably, "North Carolina courts and lawmakers have long recognized the state's duty to provide medical care to prisoners," Medley v. North Carolina Dep't of Corr., 330 N.C. 837, 842, 412 S.E.2d 654, 657 (1992), and the "legislature has codified this duty in a statute requiring [the North Carolina Department of Adult Corrections] to 'prescribe standards for health services to prisoners, which shall include preventive, diagnostic, and therapeutic measures on both an outpatient and hospital basis, for all types of patients,'" id., 412 S.E.2d at 658 (quoting N.C. Gen. Stat. § 148-19); see also Spicer v. Williamson, 191 N.C. 487, 132 S.E. 291, 293 (1926) ("The prisoner by his arrest is deprived of his liberty for the protection of the public. It is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself.").

Separately, North Carolina law recognizes a claim for medical malpractice, "[a] civil action for damages for personal injury or death arising out of the furnishing or failure to furnish

51

professional services in the performance of medical, dental, or other health care by a health care provider." N.C. Gen. Stat. § 90-21.11(2)a.[26] For a plaintiff to succeed on a medical-malpractice claim, "the trier of fact [must be satisfied] by the greater weight of the evidence that the care of [the defendant] health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances at the time of the alleged act giving rise to the cause of action." N.C. Gen. Stat. § 90-21.12(a); see also Waynick v. Reardon, 236 N.C. 116, 121, 72 S.E.2d 4, 8 (1952) (explaining that "the law of negligence holds a physician or surgeon liable for an injury to a patient proximately resulting from a want of that degree of knowledge and skill ordinarily possessed by other members of his profession, or for a failure to use reasonable care and diligence in the practice of his art, or for his failure to exercise his best judgment in the treatment of his patient"). "Because questions regarding the standard of care for health care professionals ordinarily require highly specialized knowledge," plaintiffs typically must rely on

---

26 A "[h]ealth care provider" means "[a] person who pursuant to the provisions of Chapter 90 of the General Statutes is licensed, or is otherwise registered or certified to engage in the practice of or otherwise performs duties associated with any of the following: medicine . . . ." N.C. Gen. Stat. § 90-21.11(1)a.

52

expert witness testimony to establish their claim.  <u>Smith v.</u> <u>Whitmer</u>, 159 N.C. App. 192, 195, 582 S.E.2d 669, 671-72 (2003).

However, "[t]he absence of expert medical testimony, disapproving the treatment or lack of it, is not perforce fatal to [a plaintiff's] case.  There are many known and obvious facts in the realm of common knowledge which speak for themselves, sometimes even louder than witnesses, expert or otherwise."  <u>Gray v.</u> <u>Weinstein</u>, 227 N.C. 463, 465, 42 S.E.2d 616, 617 (1947); <u>see</u> <u>id.</u> at 464-65, 42 S.E.2d at 616-17 ("agree[ing] with the plaintiff" — who argued "that, with knowledge of the child's condition, the defendant failed to exercise due care in waiting more than ten hours before seeing the patient[, a toddler who ingested multiple aspirin pills]; and further that he omitted to exercise an enlightened judgment in pumping out his stomach without first ascertaining whether 'he could take it'" — "that whether the defendant proceeded with due and ordinary care, under the circumstances and conditions shown by the record, was a question of fact for the jury").  In other words,

> not all things about the practice of medicine have to be testified to by a doctor.  The proper medical standards for treating some illnesses and conditions are matters of common knowledge. . . .  When the evidence of lack of ordinary care is patent and such as to be within the comprehension of laymen, requiring only common knowledge and experience to understand and judge it, expert testimony is not required.

<u>Chapman v. Pollock</u>, 69 N.C. App. 588, 596, 317 S.E.2d 726, 732 (1984) (internal quotation marks and citation omitted); <u>see</u>

53

also id. at 597, 317 S.E.2d at 733 ("Even in the absence of expert testimony about proper standards of care, th[e] evidence was sufficient, in our opinion, to support the inference that [the defendant's] failure to examine and treat [the] plaintiff further under the circumstances testified to was contrary to medical standards approved and generally followed by the profession, and thus negligent."). Often described as invoking the doctrine of res ipsa loquitur, such circumstances support an inference of negligence sufficient to take a case to the jury. See Mitchell v. Saunders, 219 N.C. 178, 13 S.E.2d 242, 244-46 (1941).

## II. Analysis

### A. Deliberate Indifference Claim

In her Supporting Memorandum, Dr. Bosholm seeks summary judgment on Plaintiff's deliberate indifference claim on two grounds. (See Docket Entry 117 at 5-8.) First, she argues (in full):

> Plaintiff's testimony establishes that this Defendant did not act with deliberate indifference to his medical needs when he denied ever having any concerns with his care. Plaintiff testified as follows:
>
> 7 Q Sitting here today, have you ever had any
> 8 concerns with any treatment that Dr. Bosholm has given
> 9 you?
> 10 A No.
>
> [Ex. D, T. 49, L. 7-10].

(Docket Entry 117 at 6 (formatting in original).) This argument fails to justify summary judgment.

54

As an initial matter, in the same deposition — indeed, on the preceding page to the quoted material, — Plaintiff testified that he lacks any memory regarding the events associated with his illness in February 2016. (See, e.g., Docket Entry 120-1 at 10-14, 27.) He further testified that he "do[es] not remember" "Dr. Bosholm's role or any treatment that she gave [him] when [he] got sick in February of 2016." (Id. at 27.) He also testified in response to the question, "Sitting here today, are you able to state that Dr. Bosholm did anything wrong in February of 2016 in terms of your care?," that "[he] do[es] not know." (Id.)[27] This testimony significantly undermines Defendant's position. Moreover, Defendant provides no support for the notion that Plaintiff's quoted testimony precludes his deliberate indifference claim (see Docket Entry 117 at 6), and neither element of a deliberate indifference claim requires evidence from a plaintiff personally expressing concern regarding a defendant's actions, see Iko, 535

_____

27  Additionally, a significant portion of Plaintiff's claims against Dr. Bosholm involve a lack of treatment and failures regarding the quarantine (see, e.g., Docket Entry 119 at 1-12, 16-25) and the pertinent question involved solely "treatment" that Dr. Bosholm provided, a concept which the relevant deposition testimony suggests Plaintiff may view as involving a medical appointment (see Docket Entry 120-1 at 27 (Plaintiff testifying that he saw Dr. Bosholm at a prison after his release from hospital, with the following exchange between defense counsel and Plaintiff: "Q. And for what reason did you see her?  A. No, it wasn't like a treatment. I just saw her.  Q. Okay. So like you just saw her in the hallway or in passing or something like that?  A. I saw her, she was in her office there in the medical room.  Q. Did you talk to her?  A. No, because I didn't have any business to do with her.")).

55

F.3d at 241.  As such, Defendant's first argument for summary judgment falls short.

Second, focusing on Plaintiff's asserted amoxicillin allergy, Defendant argues that she "cannot be deemed to have acted recklessly with respect to any prescription of amoxicillin." (Docket Entry 117 at 7; <u>see</u> <u>id.</u> at 5-8.)  In his Response, Plaintiff does not dispute Defendant's allergy-related arguments. (<u>See generally</u> Docket Entry 119.)  Instead, he argues that (i) his deliberate indifference claim extends beyond the amoxicillin allergy issue and (ii) because Dr. Bosholm "focuses her argument for summary judgment solely on . . . Plaintiff's amoxicillin allergy[,] . . . . summary judgment cannot be granted in her favor" (<u>id.</u> at 17).  (<u>See</u> <u>id.</u> at 1-12, 14-25.)  More specifically, Plaintiff lists a litany of his alleged non-allergy-related "serious medical needs" (<u>id.</u> at 16) and coordinate failures by Dr. Bosholm (<u>id.</u> at 22-24).  (<u>See also, e.g.,</u> <u>id.</u> at 1-12 (detailing relevant evidence).)  He then argues that Dr. Bosholm "focuses her argument for summary judgment solely on whether Plaintiff's amoxicillin allergy constituted a serious medical need.  As Dr. Bosholm does not argue anything related to Plaintiff's other serious medical needs, summary judgment cannot be granted in her favor." (Docket Entry 119 at 17 (citation omitted) (citing Docket Entry 117 at 5-8).)  He further asserts:

> Dr. Bosholm did not argue in her Motion that she did not place Plaintiff had a substantial risk of serious harm,

56

that she did not recognize the risk, or that she acted
appropriately as to any serious medical need of Plaintiff
other than his amoxicillin allergy. Accordingly, summary
judgment cannot be granted in her favor.

(Id. at 24-25.)

In her Reply, Defendant does not contest these arguments.
(See generally Docket Entry 123.) Instead, she contends that
"several of the factual assertions in Plaintiff's Response only
constitute conclusory statements that are either unsupported or
blatantly contradicted by the evidentiary record." (Id. at 2.)
Defendant specifically identifies only two such allegedly
unsupported statements (see id. at 2-3) before arguing:

> Overall, Plaintiff's Response contains a vast number
> of citations to alleged "evidentiary support in the
> record" as a basis for conclusory assertions that are
> misleading and inaccurate. Plaintiff cannot rely on
> speculation and conjecture to avoid summary judgment.
> Plaintiff bears the burden of proof to identify specific
> facts in evidence which create a genuine issue of
> material fact and has failed to do so in this instance.
> Plaintiff instead relies upon voluminous citations
> contained in dozens of footnotes to mask a lack of
> evidentiary support for his assertions.

(Id. at 3.)

Next, Defendant argues that "Plaintiff's Response fails to
provide supporting case law authority and evidentiary support of a
material dispute of fact suggesting that he presented to
[Defendant] with a 'serious medical need' for which she delayed
treatment." (Id. at 5; see id. at 4-5 (asserting that Plaintiff
relies on distinguishable cases regarding his alleged serious
medical needs).) Finally, she states:

57

> Plaintiff['s] Response likewise does not create a
> material issue of fact as to Dr. Bosholm's purported
> "deliberate indifference." Plaintiff asserts that Dr.
> Bosholm knew of a substantial risk to Plaintiff's health
> that she deliberately ignored from February 26, 2016 to
> February 29, 2016. Plaintiff's Response cites several
> cases identifying potential scenarios where deliberate
> indifference by a medical provider was found. However,
> none of these cases apply here.

(Id. at 5-6.) In conjunction with this last argument, Defendant maintains that "Plaintiff does not provide any support from the evidentiary record to support [his] assertions" (id. at 7) regarding her actions during this period (see id. at 7-8). These contentions miss the mark.

As courts have repeatedly recognized, "a party who fails to address an issue has conceded the issue," Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08cv918, 2010 WL 1667285, at *8 (M.D.N.C. Apr. 23, 2010) (collecting cases). See id. at *6-9. Moreover, "[a] party waives an argument by failing to present it in [her] opening brief or by failing to develop [her] argument — even if [her] brief takes a passing shot at the issue." Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017) (internal quotation marks omitted). Finally, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

58

<u>Celotex</u>, 477 U.S. at 323; <u>see also</u> <u>id.</u> at 325 (noting "the burden of the moving party . . . to show initially the absence of a genuine issue concerning any material fact" (ellipsis in original) (internal quotation marks omitted)).

In her Supporting Memorandum, Defendant developed an argument only regarding the amoxicillin-allergy aspect of Plaintiff's deliberate indifference claim. (<u>See</u> Docket Entry 117 at 5-8.) Moreover, in her Reply, she did not dispute Plaintiff's argument that she failed to seek summary judgment on the non-allergy-related aspects of his deliberate indifference claim. (<u>See</u> Docket Entry 123 at 1-8.) Accordingly, Defendant cannot secure summary judgment on the non-allergy-related aspects of Plaintiff's deliberate indifference claim. <u>See</u> <u>Celotex</u>, 477 U.S. at 323; <u>Grayson</u>, 856 F.3d at 316; <u>Kinetic</u>, 2010 WL 1667285, at *6-9. Conversely, as Plaintiff failed to dispute Defendant's entitlement to summary judgment on his allegation that Defendant acted with deliberate indifference in prescribing him amoxicillin notwithstanding his known allergy thereto, summary judgment should be entered in her favor on that aspect of Plaintiff's deliberate indifference claim. <u>See</u> <u>Kinetic</u>, 2010 WL 1667285, at *6-9.[28]

In sum, the Court should grant summary judgment to Dr. Bosholm solely on Plaintiff's allegation that she acted with deliberate

---

28  Additionally, the record evidence, detailed above, does not support a finding that Dr. Bosholm knew that Plaintiff possessed such an allergy when she prescribed him amoxicillin.

indifference in prescribing him amoxicillin because he suffered from a known allergy to it. The Court should deny summary judgment on all other aspects of Plaintiff's deliberate indifference claim against Dr. Bosholm.[29]

**B.  Negligence Claims**

Defendant also moves for summary judgment on Plaintiff's negligence claims. (See Docket Entry 117 at 8-22.) As an initial matter, Defendant asserts that Plaintiff's claims sound in medical malpractice and fail for lack of certification under N.C. Rule 9(j). (See id. at 9-11.)[30] Defendant then contends that "Plaintiff failed to forecast evidence of (i) the applicable standard of care, (ii) that this Defendant breached the applicable standard of care, or (iii) proximate cause." (Id. at 12.) As grounds for these contentions, Defendant maintains that Dr. Bilbro (i) "does not qualify as a standard of care expert" (id.), (ii) "articulated no criticisms of the care provided to Plaintiff by Dr. Bosholm" (id.

---

29  Defendant also asserts that qualified immunity protects her from Plaintiff's claims. (See Docket Entry 117 at 22-23.) She bases this argument solely on her assertion that "Plaintiff did not plausibly allege that this Defendant violated any constitutional rights, as discussed in detail, above, in Section I of this Defendant's [Supporting Memorandum]." (Id. at 23; see id. at 22; see also id. at 5-8 (Section I of Supporting Memorandum).) Accordingly, Defendant's qualified immunity arguments afford her no independent basis for summary judgment (but rather falter for the same reasons that her primary argument on the merits falters).

30  In so arguing, Defendant fails to address Plaintiff's claims regarding Defendant's responsibility for the contours of the quarantine, including alleged failures regarding monitoring instructions to the guards (who lack medical training). (See id.)

60

at 16), and (iii) "did not establish a causal link between any actions by this Defendant and Plaintiff's alleged injuries" (id. at 17) because "Dr. Bilbro's testimony focuses on linking Plaintiff's alleged injuries to treatment (or alleged lack of treatment) during a timeframe when Dr. Bosholm did not care for Plaintiff" (id. at 18). In the alternative, Defendant argues that "Plaintiff's negligence claims, if treated as such, still fail" (id. at 19) because, as relevant here, Plaintiff allegedly

> has not forecast evidence of what "duty" this Defendant might have owed him, and he has certainly not forecast any evidence of this Defendant breaching an alleged duty. To the contrary, as discussed throughout this [Supporting Memorandum], his evidence has instead established that this Defendant instead properly cared for him, and that none of her actions contributed to any medical issues of which Plaintiff now complains. Neither Plaintiff nor his sole expert witness articulated any criticisms of this Defendant in their depositions.

(Id. at 20.) These arguments miss the mark.

To begin, as this Court has already determined, N.C. Rule 9(j) affords Defendant no relief. (See Docket Entry 66 at 39-42.) Under this rule,

> a plaintiff's medical[-]malpractice complaint must assert that the medical care has been reviewed by a person who is reasonably expected to qualify (or whom the plaintiff will move to qualify) as an expert witness and who is willing to testify that the medical care received by the plaintiff did not comply with the applicable standard of care. Alternatively, the complaint must allege facts establishing negligence under the common-law doctrine of res ipsa loquitur.

Deal v. Central Prison Hosp., No. 5:09-CT-3182, 2011 WL 322403, at *4 (E.D.N.C. Jan. 27, 2011) (citation omitted).

61

Although federal courts previously enforced N.C. Rule 9(j) and dismissed noncompliant medical-malpractice claims, see id., the United States Court of Appeals for the Fourth Circuit has recently clarified that such state-law medical-malpractice requirements conflict with the Federal Rules of Civil Procedure and thus do not apply in federal court, see Pledger v. Lynch, 5 F.4th 511, 517-24 (4th Cir. 2021); see also Alston v. Locklear, No. 1:19cv96, 2022 WL 1137229, at *7 (M.D.N.C. Apr. 18, 2022) (concluding, based on its "broad language," that "the holding in *Pledger* is not confined only to federal-court FTCA actions but applies to all federal actions," observing that, "[c]iting *Pledger*, federal courts exercising diversity jurisdiction and supplemental jurisdiction over state medical malpractice claims have held a state's certification requirements do not apply," and ruling that "[a]ny failure to comply with [N.C.] Rule 9(j) is not a basis to dismiss [the plaintiff's] medical malpractice claim filed against [the defendant] in federal court"). Therefore, N.C. Rule 9(j) does not entitle Defendant to judgment as a matter of law.

In addition, the Court need not parse which aspects of Plaintiff's negligence claims sound in medical malpractice rather than regular negligence. As a doctor operating at SCI, Defendant bore a duty, as an agent of the State, to provide adequate medical care for Plaintiff, an inmate at SCI. See Medley, 330 N.C. at 838-45, 412 S.E.2d at 655-59. Moreover, although Dr. Bilbro's lack of

knowledge regarding Defendant's training and education (<u>see</u> Docket Entry 120-2 at 10) disqualifies him as a standard of care expert witness for any medical malpractice elements of Plaintiff's negligence claims, <u>see, e.g.</u>, <u>Smith</u>, 159 N.C. App. at 196-97, 582 S.E.2d at 672-73,[31] Plaintiff alleges that "*res ipsa loquitur* applies here" (Docket Entry 119 at 28; <u>see</u> <u>id.</u> at 28-29). Defendant does not contest this assertion (<u>see</u> Docket Entry 123 at 1-13 (failing to address res ipsa loquitur argument)), thereby conceding its application, <u>see</u> <u>Kinetic</u>, 2010 WL 1667285, at *6-9, and supporting an inference of negligence sufficient to survive summary judgment, <u>see, e.g.</u>, <u>Mitchell</u>, 219 N.C. 178, 13 S.E.2d at 244-46. <u>See also</u> <u>Chapman</u>, 69 N.C. App. at 596-97, 317 S.E.2d at 732-33 (finding res ipsa loquitur applicable regarding doctor's alleged failures to treat illness).

Further, construing the evidence in Plaintiff's favor with all appropriate inferences drawn therefrom, as required at this stage of the proceedings, a reasonable fact-finder could find that Defendant, inter alia, (i) bore responsibility for the imposition, contours, and lifting of the quarantine upon the discovery of influenza in Plaintiff's unit; (ii) confined Plaintiff,

---

31 Accordingly, the Court need not resolve whether Dr. Bilbro satisfies the other criteria for qualifying as such a witness, including whether he "spent a majority of his professional time in active clinical practice . . . during the year immediately preceding the event giving rise to the litigation" (Docket Entry 117 at 14).

63

experiencing flu symptoms, including known breathing issues and a cough, to his cell, rather than, as the NCDPS Health Services policy required, a health care facility isolation room, without (A) testing him for the flu or providing an antiviral medication such as Tamiflu (instead prescribing an antibiotic clearly unsuitable to treat the (viral) flu), (B) instructing the guards on symptoms signifying a need for medical intervention, or (C) ensuring the monitoring of vitals relevant to respiratory distress; and then (iii) failed to respond to Plaintiff's recorded temperature — the highest temperature he registered over the relevant period — when she lifted the quarantine on Monday morning, thereby allowing his medical condition to continue to deteriorate until that afternoon, when medical personnel finally assessed him and sent him to hospital.  The fact-finder could further find that, as Dr. Bilbro testified, such failures enabled the progression of Plaintiff's illness to the point that he developed sepsis and entered into a coma, resulting in permanent injuries, a situation preventable by earlier intervention.[32]

_____

        32  As its "second cause of action" the Amended Complaint lodges claims of "negligence and gross negligence" against Defendant and others.  (Docket Entry 17 at 27.)  Defendant contends that "the care in this [case] certainly does not constitute gross negligence" (Docket Entry 117 at 21).  (See id. at 20-22.) Plaintiff responds that "Dr. Bosholm was deliberately indifferent to his serious medical needs" (Docket Entry 119 at 27) and thus she "was negligent and grossly negligent on the same grounds" (id. (citing Sams v. Armor Corr. Health Servs., Inc., No. 3:19cv639, 2020 WL 5835310, at *32 (E.D. Va. Sept. 30, 2020))).  In Sams, the court found that, because of well-settled similarities between

Accordingly, material factual disputes regarding Plaintiff's negligence claims (however construed) preclude summary judgment in Defendant's favor.

_____

deliberate indifference and gross negligence claims and the lesser standard for gross negligence claims, "if [the plaintiff] has stated a claim for deliberate indifference under the Eighth and Fourteenth Amendments, she has also stated a claim for gross negligence under Virginia law," Sams, 2020 WL 5835310, at *31, which "defines gross negligence as 'the utter disregard of prudence amounting to complete neglect of the safety of another,'" id. at *30; see also id. ("It is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." (internal quotation marks omitted)). North Carolina defines gross negligence similarly. See, e.g., Yancey v. Lea, 354 N.C. 48, 53, 550 S.E.2d 155, 158 (2001) ("[The North Carolina Supreme Court], in references to *gross negligence*, has used that term in the sense of wanton conduct. . . . Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others. . . . An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others, i.e., a *conscious* disregard of the safety of others." (emphasis in original) (internal quotation marks omitted)); Weatherford v. Glassman, 129 N.C. App. 618, 624, 500 S.E.2d 466, 470 (1998) ("The concept of gross negligence embodies willful or wanton conduct of the defendant that proximately causes injury to the plaintiff. Conduct is willful if it 'involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another;' and conduct is wanton if it 'is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.'" (citation omitted)). Conceding the issue, see Kinetic, 2010 WL 1667285, at *6-9, Defendant did not respond to this argument (see, e.g., Docket Entry 123 at 8 ("Plaintiff failed to create any issues of material fact as to a breach of an alleged duty (or duty of care) owed to Plaintiff or as to proximate causation regardless of which substantive laws apply in this case (ordinary negligence or medical malpractice.)[sic]"); see also id. at 8-10 (addressing only "ordinary negligence [and] medical malpractice")). Accordingly, Plaintiff's gross negligence claim survives the Motion, obviating any need for the Court to separately analyze the gross negligence aspects of Plaintiff's negligence claims.

65

## CONCLUSION

The materials before the Court establish the propriety of summary judgment only regarding Plaintiff's sub-claim that Defendant prescribed him a medication despite his known allergy to it.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 116) be granted in part and denied in part as follows: summary judgment be entered in Defendant's favor on Plaintiff's contention that Defendant prescribed him a medication despite his known allergy to it, but denied as to all other aspects of Plaintiff's deliberate indifference and negligence claims.

This 12th day of June, 2023.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
